IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

TROY ANDERSON,

      Plaintiff,

v.

STATE OF COLORADO, DEPARTMENT OF CORRECTIONS,

SUSAN JONES, in her official capacity as warden of Colorado State Penitentiary, and

ARISTEDES W. ZAVARAS, in his official capacity as Executive Director of the Colorado
      Department of Corrections,

      Defendants.

---

## COMPLAINT

---

      Plaintiff Troy Anderson, incarcerated in the Colorado State Penitentiary in Cañon City, Colorado, submits this complaint for violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act.

## PARTIES

1.     Plaintiff TROY ANDERSON is, and was at all times relevant herein, a citizen of the United States.  Mr. Anderson has been a prisoner confined in the Colorado Department of Corrections since May 25, 2000. Mr. Anderson suffers from severe mental illness that

substantially limits several of his major life activities, including, but not limited to, thinking, learning, concentrating, and interacting with others.  Mr. Anderson also has a record of such impairments and is regarded by Defendants as having such impairments.

2.      Defendant COLORADO DEPARTMENT OF CORRECTIONS ("CDOC") is a department of the State of Colorado.  The department is responsible for all inmates in the state's prison population.

3.      Defendant SUSAN JONES is the Warden of Colorado State Penitentiary ("CSP") and as such, is responsible for the custody and care of Mr. Anderson, and all prisoners in CSP.  She oversees all employees at CSP, and has authority for the establishment and implementation of all policies and procedures at the institution.

4.      Defendant ARISTEDES W. ZAVARAS is the Executive Director of CDOC and as such, is responsible for the custody and care of Mr. Anderson and all prisoners in CDOC.  He oversees all employees in CDOC, and has authority to establish, alter, and implement all policies and procedures within CDOC.

## JURISDICTION AND VENUE

5.      This Court possesses subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      Venue of this action is proper in the District of Colorado under 28 U.S.C. § 1391(b).

## NATURE OF THE CASE

7.       Defendants are excluding Mr. Anderson from programs and activities, denying him privileges afforded nondisabled prisoners, and otherwise discriminating against him based on conduct (more accurately, Defendants' perception of the possibility of conduct) that is a direct

result of his disability and/or based on Defendants' perception of him as disabled and/or his history of disability, while at the same time denying him access to the diagnosis and treatment that would permit him to control that conduct.  Among the programs and activities to which he is being denied access are those that would permit him to progress out of administrative segregation and reduce the length of his sentence.  Defendants' discrimination thus has the effect of isolating and segregating him within the prison and prolonging his sentence.  In the alternative, to the extent that Defendants are punishing him for behavior – or their perceived possibility of behavior – that is the result of his disability, he is entitled to the reasonable accommodation of conditions.

8.      Ever since he was a young child, Mr. Anderson has suffered from a severe mental disability – likely caused by an organic brain syndrome – preventing him from performing major life activities, such as learning and interacting with others and causing him to have mood swings, severe depression and bouts of impulsive behavior.  Mr. Anderson's mental health history demonstrates that he cannot function properly absent proper treatment and accommodations.  Even though Defendants are aware of his long history of mental health concerns, for nearly a decade they have failed to provide him adequate mental health care and have discriminated against Mr. Anderson because of his disability.

9.      Even when Defendants' own doctors have prescribed medications that they believed necessary to treat Mr. Anderson's mental conditions, Defendants have repeatedly refused to provide such medication.   Mr. Anderson was never informed of why he could not receive these ordered medications, and why he is denied access to these and other medications most likely to address his mental health needs.

10.     Furthermore, the failure to provide adequate treatment has resulted in further discrimination, as Mr. Anderson has repeatedly been denied the ability to progress out of segregation, based on behavior that is the direct result of his disability.  He also was denied access to Offenders with Mental Illness—a program designed for inmates with mental illnesses.  This denial was specifically because of the manifestations of his mental disability, behaviors that have not been appropriately addressed.    Accordingly, Mr. Anderson seeks to have his mental health needs diagnosed and treated appropriately with the proper medication.

11.     Defendants – who have already held Mr. Anderson in solitary confinement for nearly a decade – continue to retain him there indefinitely.  While Mr. Anderson does not have a life sentence, his retention at CSP essentially ensures that he will die in prison.  If he were allowed to earn his way out of CSP administrative segregation he would be eligible for good time credits, which could greatly reduce his sentence.  But, as a matter of policy, CSP prisoners are ineligible for these credits, even with good behavior.

12.      Instead of providing treatment to address these behaviors and allow Mr. Anderson to progress out of segregation, Defendants continue to subject Mr. Anderson to punitive measures.  Defendants assert that their punitive policies, for example limiting prisoners to owning only two books, are an incentive for prisoners to behave.  Yet, when the behavior (or perceived possibility of behavior) is a result of a mental health condition, these intentionally restrictive policies fail to provide any meaningful incentive, or further a legitimate penological goal.  Rather, they merely punish Mr. Anderson for his mental illness.

13.      Among the punitive measures leveled against Mr. Anderson, Defendants have a policy to never allow him – or any other inmate at Colorado's "supermax" – outside.   Accordingly, Mr.

Anderson has gone nearly a decade without seeing or feeling the sun.  His only recreation takes place in the "day hall," an indoor room with a floor, ceiling, and four walls.  The "day hall" is not outside, nor does it allow even a view of the sun.  Mr. Anderson has access to this "day hall" merely five hours a week, during which time he also must shower. Furthermore, time in the "day hall" is not guaranteed and is frequently cancelled during prison lockdowns.  Although Defendants are aware that many CSP prisoners, including Mr. Anderson, do not have access to the outside for years or decades, they have been deliberately indifferent to this substantial mental and physical health risk.  Defendants have simply ignored the detrimental health effects a person experiences when he is not allowed time outdoors in the sun and fresh air.  Mr. Anderson seeks to have this inhumane form of punishment ended, and to be able to regularly feel the sun and wind on his skin.

14.     CDOC continues to hold Mr. Anderson in the solitary conditions at CSP through a monthly review process that is entirely arbitrary and insufficient.  Under the current review system, if an inmate receives a "chron" he cannot leave solitary confinement.  A "chron" is a note of negative or positive behavior entered into the prisoner's record at the discretion of prison personnel, which is used to determine a prisoner's security classification.  However, the issuance of chrons is arbitrary; a guard can enter one for any behavior, including small, subjective infractions such as "being non-responsive."  Prisoners have no notice of chrons, cannot dispute their issuance, and there is no meaningful way for inmates to challenge the chrons after their issuance, as there is with formal infractions.  Yet, even absent these protections, the chrons have as much impact on a prisoner's review as formal disciplinary infractions, which are given for more serious prisoner misconduct only after a disciplinary hearing process.  Furthermore, the

prison uses these chrons in violation of their own operational memorandum.  Mr. Anderson seeks to have this practice abolished and replaced with a system that recognizes a prisoner's right to due process in determining his or her classification.

## FACTS

**A.      Mr. Anderson has a long history of mental health concerns and treatment.**

15.      Mr. Anderson was born on November 12, 1969.  He was adopted as an infant by Darrell and Carol Anderson.

16.      Mr. Anderson has had mental health issues throughout his life.  According to his mother and father, Mr. Anderson has struggled with his emotions from the time he was a baby. Numerous reports have been written by mental health professionals to document the existence of Mr. Anderson's mental illnesses and disabilities.

17.      Mr. Anderson began treatment for his mental health issues starting at age five when his parents treated his bedwetting with imipramine, an antidepressant, and noticed positive behavioral side effects.

18.      Over the years Mr. Anderson has been diagnosed and assessed with many mental health illnesses, including Attention Deficit Hyperactivity Disorder, Anti-Social Personality Disorder, Intermittent Explosive Disorder, bipolar disorder, cognitive disorder, a seizure disorder and polysubstance dependence.

19.      According to Mr. Anderson and his parents, outside a proper therapeutic setting, he has never been able to control his emotions and anger, which has resulted in family dysfunction and Mr. Anderson being incarcerated for 23 of his 40 years.

20.     Throughout his childhood Mr. Anderson struggled with mental illness and suicidal ideations.  In 1980, at age ten, Mr. Anderson took an automatic pistol from his father's gun collection intending to commit suicide.

21.     Shortly after this incident, Mr. Anderson wrote a note to his teacher indicating that he had bad feelings and sometimes wished he were dead.  In response to this note, his parents had him admitted to the Mental Health Center of Boulder County ("MHCBC") under a "crisis intake."

22.     At the MHCBC, Dr. Schmitt determined that even as a child, Mr. Anderson already had "mood swings and strong guilt feelings around his aggressive and explosive urges."

23.     At MHCBC, Mr. Anderson also was evaluated by Dr. Larson who diagnosed Mr. Anderson with Attention Deficit Disorder ("ADD").

24.     Dr. Larson ordered that Mr. Anderson's imipramine be discontinued and ordered Mr. Anderson's ADD be treated with Ritalin.  At the time, Mr. Anderson's parents noted a positive "remarkable change" to their son's behavior after his ADD was properly medicated.  However, Mr. Anderson's parents discontinued his medication after only a few months.

25.     In 1983, Mr. Anderson ran away from home and threatened to kill himself.  Mr. Anderson tried both family and individual therapy, but ultimately his parents sought assistance from mental health professionals at several facilities. During this time, he repeatedly tried to hurt himself, cutting himself on multiple occasions, at times severely enough to require stitches. On more than one occasion he ran away from the facility.

26.     In 1984, Mr. Anderson was placed at the Boulder Psychiatric Institute ("BPI") as part of a plea agreement for several non-violent crimes.

27.     At BPI, Mr. Anderson was seen by Dr. Freedman in August of 1984.  Dr. Freedman

believed Mr. Anderson was probably psychotic and recommended treatment with antipsychotic

medication.

28.     While at BPI, Mr. Anderson received comprehensive behavior therapy along with

recommended medications.  During his time at BPI, staff noted that Mr. Anderson's psychosis,

rage, and violent acting out had significantly improved and that he had made "considerable

progress."

29.     When Mr. Anderson was released from BPI at the age of sixteen, he had a variety of

diagnoses.  Despite these conditions, his medications were discontinued upon release.

30.     Without proper medication and treatment Mr. Anderson's behavior deteriorated.  In May

1987, a warrant was issued for Mr. Anderson's arrest for aggravated armed robbery and theft.

31.     Mr. Anderson was eventually arrested in California.  While in jail in California, Mr.

Anderson attempted suicide twice.  In November 1987, Mr. Anderson was sent back to Colorado

to the custody of CDOC.  He was placed by court order at the Fort Logan Mental Health Center

("Fort Logan") for mental health testing.

32.     As part of the court order, the judge required that Mr. Anderson be evaluated by a mental

health professional.  Dr. Eugene Schwartz evaluated Mr. Anderson.  In Dr. Schwartz's report to

the court, he stated that Mr. Anderson was mentally ill and that a prison environment would be

very likely to lead to Mr. Anderson becoming psychotic and suicidal.

33.     After the court-ordered mental health evaluation, Mr. Anderson was discharged from Fort

Logan in March 1988 and committed to the Mount View School ("Mount View") (now Mount

View Youth Services Center) in the Closed Adolescent Treatment Center for a term of five years for aggravated robbery.

34.     Within seven days of being transferred to Mount View, Mr. Anderson attempted suicide.

35.     Mr. Anderson was later transferred into CDOC custody at Fremont Correctional Facility to serve the remainder of his sentence in an adult facility.  In March of 1991, Mr. Anderson was transferred to Centennial Correctional Facility ("CCF").

36.     Frustrated by not being properly diagnosed and treated throughout his life, Mr. Anderson started refusing mental health treatment and started acting out.

37.     Following this gap in mental health care, Mr. Anderson's behavior continued to worsen. He had many confrontations with other inmates and CDOC staff, write-ups from CDOC staff, an additional assault charge, and placement in administrative segregation in October 1993 at CSP for his behavior.

38.     Based on his erratic behaviors and mental health concerns while incarcerated at CSP, Mr. Anderson was sent to San Carlos Correctional Facility ("SCCF"), a CDOC facility for mentally ill prisoners, for evaluation in October 1996.  However, Mr. Anderson did not receive the appropriate mental health treatment because he was returned shortly to CSP.

39.     After being returned to CSP, Mr. Anderson did not participate in mental health services because of his frustration with CDOC and struggles with his mental health.

40.     In October 1997, at age twenty-seven, Mr. Anderson was released from CSP.

41.     For the next year, Mr. Anderson was incarcerated intermittently.  He used illegal drugs to self-medicate his mental health issues, including methamphetamines, to which he became addicted.

42.     In December 1998, Mr. Anderson was arrested by Commerce City Police an attempted to escape arrest, but eventually surrendered.

43.     In March 1999, Mr. Anderson again attempted to escape police captivity while being transported, but surrendered to police.

44.     According to court documents, when asked for Mr. Anderson's statement at the presentence interview for his convictions in 2000, Mr. Anderson responded, "I wish I would have done more to get on medication so this wouldn't have happened."

45.     On March 20, 2000, Mr. Anderson was convicted of charges related to menacing as well as attempted murder related to his escape attempts.

46.     His mother testified at the trial that she wanted him to get the proper help and medications he has always needed throughout his life.

47.     Adams County Judge Richter, in his recommendations for Mr. Anderson at his sentencing on March 20, 2000, advised CDOC that Mr. Anderson needed mental health services and recommended he be sent to SCCF to be evaluated and given such services as part of the sentence.

**B.     Mr. Anderson has not received proper treatment, diagnoses and medication while at CSP.**

48.     CDOC has been on notice of Mr. Anderson's mental health care needs from the beginning of his first incarceration in 1991 through today.

49.     Mr. Anderson's extensive mental health concerns are documented in CDOC's own records, as well as records provided to them from other mental health institutions, providers and court documents.  These records establish his mental health disabilities and his need for on-going mental health diagnosis, treatment, and proper medication.  In addition, since his incarceration in

2000, Mr. Anderson has continually asked for help, participated in, and advocated for the mental health services he needs.

50.     Following sentencing for his March 2000 convictions, Mr. Anderson was placed directly into administration segregation at Denver Reception and Diagnostic Center ("DRDC").  Shortly thereafter, Mr. Anderson was moved from DRDC to administrative segregation at CSP.

51.     After a few months at CSP, Defendants moved Mr. Anderson to SCCF to be treated for his mental health issues in October 2001.

52.     While at SCCF, Mr. Anderson worked with mental health staff.  Mr. Anderson was noticeably less angry, irritable and combative while at SCCF where he was receiving treatment.

53.     While at SCCF Mr. Anderson's medications were adjusted when medical staff determined that some of his prescriptions had side effects that made him more unstable and combative.  Defendants acknowledged that Mr. Anderson's behavior had been impacted by these prescriptions.

54.     After only one month of promising treatment at SCCF, CDOC transferred Mr. Anderson back to CSP.

55.     This move occurred against the wishes of his therapists and doctors at SCCF, who believed that SCCF was the best placement to address Mr. Anderson's mental illnesses.

56.     In his brief time at SCCF in 2001, Mr. Anderson was initially assessed as having Intermittent Explosive Disorder ("IED") and Anti-Social Personality Disorder ("ASPD"). However, because CDOC allowed Mr. Anderson to stay at SCCF for only a short time, additional necessary testing was not completed.

57.     For the past decade, since his return from SCCF, Mr. Anderson has been housed at CSP and has not been provided proper mental health care.  Despite requests and recommendations from his therapists at CSP for neurological testing and other diagnostic tests, CDOC failed to take steps to accurately determine his mental health needs.

58.     After his return to CSP in 2001, Mr. Anderson slipped into a depression.  For the first few months, he did not actively participate in mental health treatment, including taking medication.  However, recognizing he needed help, he soon began seeking treatment.

59.     Staff at CSP disregarded the work done by mental health professionals at SCCF and prescribed the same medications that had given him the side effect of being combative, and that had been determined to be a cause of many problems for Mr. Anderson.  Mr. Anderson realized what these medications would do to him from his treatment at SCCF and refused to take them.

60.     Mental health staff did not employ the standard mental health practice of trying Mr. Anderson on a variety of mental health medications, taking note of the efficacy of each, specifically to determine what would work for him.

61.     Upset with the inadequate treatment he was receiving, Mr. Anderson went on a hunger strike in November of 2000, in an attempt to bring attention to the conditions and unfair policies facing prisoners at CSP.  The hunger strike was specifically focused on the lack of treatment for himself and other individuals with mental health disabilities.  He remained on his hunger strike for two weeks and lost over ten pounds.

62.      During his time at CSP, Defendants have failed to provide Mr. Anderson with adequate mental health treatment.  At times, Mr. Anderson did not receive *any* mental health treatment.

Mr. Anderson repeatedly requested additional mental health care, even voicing his concern about the inadequacy of his care to the warden.

63.    In April of 2004, Dr. Steele administered to Mr. Anderson an Adult Attention Deficit Hyperactivity Disorder ("ADHD") test and evaluated him as having "significant" symptoms in 17 out of 18 factors.  CSP mental health staff has acknowledged that this test indicates Mr. Anderson suffers from severe adult ADHD.

64.    Stimulant treatment is common for adult ADHD.  The only non-stimulant medication used for adult ADHD that is generally accepted by the medical community for adults is Strattera.

65.    According to the Colorado Department of Corrections Formulary regulations no stimulant medications are authorized unless an inmate is granted an exception at the request of his doctor.

66.    Defendants' psychiatrist prescribed Mr. Anderson Wellbutrin, a stimulant, and Strattera, the stimulant alternative, to treat his ADHD.  However, Defendants have refused to provide Mr. Anderson either of these medications or any other stimulant equivalent that would work to treat his ADHD.

67.    Defendants have recognized Mr. Anderson's mental disabilities, including ADHD and other diagnoses.

68.    Despite recognizing his severe mental illness, Defendants continually fail to treat Mr. Anderson's mental illnesses with appropriate medication.

69.    Mr. Anderson's psychiatric medications have been mismanaged and, at times, used inappropriately to punish Mr. Anderson by CSP staff.  In one instance, CSP assigned a physician's assistant, Travis Waters, to oversee Mr. Anderson's psychiatric medications rather

13

than a psychiatrist.  After a disagreement between Mr. Anderson and the Mr. Waters about what medications were appropriate, Mr. Anderson refused further meetings with him.  Mr. Anderson did so because he did not believe Mr. Waters had his best interest in mind.

70.     Rather than trying to resolve this issue by further discussion or consideration of Mr. Anderson's concerns, Mr. Waters retaliated against Mr. Anderson by abruptly discontinuing his prescription of the drug Effexor, which he was receiving for anxiety in February 2007.  As a result, Mr. Anderson experienced extreme symptoms, including nausea, vomiting, muscle cramps, severe headaches and dizziness.

71.     The manufacturer of Effexor informs providers and patients that discontinuation of the drug can cause the appearance of new symptoms, including: agitation, anorexia, anxiety, confusion, impaired coordination and balance, diarrhea, dizziness, dry mouth, dysphoric moods, nightmares, fatigue, flu-like symptoms, headaches, hypomania, insomnia, nausea, nervousness, sweating, tremors, vertigo, vomiting and more.  The manufacturer recommends not taking anyone off the drug without gradually lowering the dosage.

72.     Defendants have continually failed to provide necessary testing and treatment to Mr. Anderson.

73.     CDOC psychiatrist Dr. Peggy Steele noted on September 1, 2006 that Mr. Anderson continues to be diagnosed with ADHD and Cognitive Disorder NOS.  She said he seems to "display traits" of Borderline Personality Disorder, and Antisocial Personality Disorder with Narcissistic features.  She also mentions IED is congruent with much of Mr. Anderson's erratic behavior and mania throughout his life.

74.     Defendants have been on notice that Mr. Anderson needs further testing to determine his mental health care diagnoses and needs.  CSP's medical personnel have recommended Mr. Anderson have assessments for neurological issues.  These and other standard diagnostic tests have never been performed.

75.     Despite knowledge of Mr. Anderson's severe conditions, at times CSP fails to provide regular visits with a therapist.  Mr. Anderson recently went over 12 weeks, from December 2009 to February 2010, and March 2010 until late April 2010, without seeing a mental health professional.  Defendants, including Warden Jones, were aware of this lapse as Mr. Anderson has asked repeatedly when he would get to speak to a provider.

76.     On September 25, 2009, Mr. Anderson submitted a request for accommodations for his mental disabilities.  Mr. Anderson's requests for all accommodations were denied because of a determination that he is not disabled, saying "we have determined you do not have a mental health disability."

77.     This decision was counter to Mr. Anderson's long mental health history and CSP's continual consideration of him to be placed in a program specifically designed for individuals with mental illness.

78.      This response was given to Mr. Anderson without the utilization of an interactive process by CDOC personnel.  At all times, Mr. Anderson made himself available and was willing to participate in the interactive process.

**C.** **Without proper treatment and/or accommodation Mr. Anderson cannot qualify for any programs that permit him to earn his way out of administrative segregation at CSP.**

79.     Mr. Anderson continues to seek to progress to a lower security level in conjunction with working on his mental illness.  According to CDOC regulations, CSP is a maximum security prison that all prisoners can progress out of with good behavior.  Currently, Mr. Anderson is not able to participate in any step-down programs because of behavior that is a direct result of his disabilities.  Accordingly, Mr. Anderson remains in maximum administrative segregation indefinitely because of the lack of treatment and accommodation for his mental health needs.

80.     To be moved from to a lower security prison Mr. Anderson must maintain positive behavior according to the Colorado Department of Corrections.  This requirement does not include any consideration of Mr. Anderson's mental health needs, including assessments of ADHD, IED, Borderline Personality Disorder, and ASPD, which result in loss of control over behavior.

81.     One program in which Mr. Anderson seeks to be able to participate is the Offenders with Mental Illness ("OMI") program.  Mr. Anderson satisfies the listed criteria to qualify for this program.

82.     In October 2006, Mr. Anderson was approved though several steps of the intake process for the program, but ultimately was denied participation.  The reason given to Mr. Anderson for his denial was because of concerns with his "possible negative behavior."  Without appropriate treatment and accommodations from Defendants, Mr. Anderson is not being permitted to participate in the OMI program.

83. After being denied entrance into the OMI program, Mr. Anderson grieved the denial. In response to his grievance, CSP notified Mr. Anderson that his participation in the OMI program posed significant security concerns because of his anger issues. However, Mr. Anderson has not had any disciplinary infractions or convictions in CSP since 2005, when he received an incident report for giving envelopes to another prisoner.

84. Mr. Anderson's behaviors are manifestations of biological impairments beyond his control. Defendants have punished Mr. Anderson for these disabilities, and his continued confinement in administrative segregation – with all attendant restrictions – is a direct result of Defendants' discrimination on the basis of Mr. Anderson's disabilities.

**D. The formulary board denied the psychiatrists' prescriptions, refusing to provide necessary treatment to Mr. Anderson.**

85. Mr. Anderson has never received any form of discipline for improper use, sale, or bartering of his medications.

86. CDOC staff members are aware that Mr. Anderson's mood swings and anger are a part of his mental illness. In one report, his CSP therapist, Mr. Arave wrote, "Definitely, he could benefit from stabilizing psych meds. He has a history of being addicted to his anger as the primary mode of coping and dealing with frustration."

87. CSP medical personnel are able to freely prescribe and dispense medications that have been approved by CDOC Drug Formulary. This formulary includes medications for treatment of mental illnesses. Any inmate is eligible to be prescribed and receive medication from the prison.

88. CSP medical personnel who believe patients require medications that have not been approved by the statewide formulary board can request an exception that may be granted at the

discretion of the CSP formulary review board.  If the exception request is denied, that denial may

be appealed to a state formulary review board that makes the final determination.

89.    Only the prescribing physician may request a formulary exception, and only the

prescribing physician may appeal a formulary decision.

90.    CDOC Drug Formulary precludes individuals with ADHD, such as Mr. Anderson, from

receiving standard treatments and medications.  According to CSP staff, there are no stimulants

on CDOC Formulary.  Stimulants are the most common prescription treatment for adult ADHD.

91.    CDOC's refusal to prescribe stimulants for individuals with adult ADHD is

discriminatory.  Adults with ADHD need proper medical treatment, including drugs, as

prescribed by the doctors, so that they can manage their behaviors and earn privileges and

progress to lower classification levels.

92.    The formulary board at CSP is comprised of two individuals, Dr. Koprivinikar and Mr.

Travis Waters.  Mr. Waters is a Physician's Assistant and not a medical doctor or psychiatrist.

Mr. Waters is also the individual who abruptly took Mr. Anderson off Effexor without

appropriately decreasing the dosage, causing him significant pain.  Mr. Waters is a biased

decision-maker when it comes to reviewing requests involving Mr. Anderson.  His presence on

the formulary board prevents Mr. Anderson from receiving a fair consideration for any exception

request.

93.    Mr. Anderson was prescribed Strattera, a non-stimulant treatment for adult ADHD, on

July 15, 2004, by his psychiatrist at the time, Dr. Miller.  Dr. Miller made a request to the

formulary board for this medication.

94.     Mr. Anderson was denied this medication by the formulary board shortly thereafter. Again, no reason for the denial has been given to Mr. Anderson.

95.     Dr. Miller told Mr. Anderson he appealed the decision by the CSP formulary board denying Strattera for Mr. Anderson to the state formulary, which also denied the request.  Again, Mr. Anderson was given no explanation for this denial.

96.     In April of 2007, Mr. Anderson's psychiatrist and therapist, Dr. Westcott and Dr. Steele, determined that Wellbutrin, a stimulant, was necessary for proper treatment of Mr. Anderson's adult ADHD.  They made the request to the CSP formulary board for Mr. Anderson to receive it.

97.     The CSP formulary rejected this request from Mr. Anderson's treating mental health professionals. No reason was given for this rejection.

98.     Mr. Anderson's therapist and psychiatrist, Dr. Steele and Dr. Westcott, appealed the denial of the Wellbutrin to the state formulary board.  The state formulary board also denied this requested medication.  Again, no reasons were provided for this rejection.

99.     Mr. Anderson has no personal recourse to appeal the decision by the formulary board rejecting his psychiatrist and therapist's request he receive Wellbutrin or Strattera.

100.    However, Mr. Anderson grieved the decision about the Wellbutrin, as well as the formulary process in general.  CSP has responded to his grievances, telling Mr. Anderson that this is not a grievable issue for CDOC inmates, even though they are the individuals who need the medications.

101.    The formulary board has never requested any information, or allowed any statement, from Mr. Anderson personally before denying requests for medications made by his physicians.

**E.     The conditions Mr. Anderson has endured for nearly a decade at CSP implicate a protected liberty interest.**

102.    Mr. Anderson's placement in administrative segregation is indefinite.   He has endured the conditions of administrative segregation at CSP since November 2000, when he returned from SCCF – a time period of over 3,350 days.

103.    Everyone housed in CSP is held in solitary confinement.

104.    Mr. Anderson is allowed no human contact at CSP.  Mr. Anderson is not even allowed to hug his family and loved ones when they come to visit.

105.    Mr. Anderson has limited ability to communicate with other inmates.  He must yell through a slot in his door.  He never sees any other inmate in person and never has face-to-face interactions with any person other than CDOC staff.

106.    Mr. Anderson's cell size is approximately 12' x 8' in size, approximately 96 square feet or the size of a small bathroom.

107.    Within his cell he has a concrete bed, a metal desk and a metal stool, which are attached to the floor, and three shelves.  He also has a metal toilet and sink.  All furniture in his cell is made of metal or concrete.

108.    Mr. Anderson's personal belongings are required to fit inside two boxes.  A single locker box is allowed for personal items and a legal cardboard box for legal documents is allowed. No personal effects or photos are allowed to be displayed.  Accordingly, he cannot even have a picture of his family visible on the wall or the shelf.

109.    Mr. Anderson has a small window that is approximately five inches wide and two feet tall.  It is permanently sealed and does not allow air in.

110.    The noise in Mr. Anderson's cell is constant, because of the concrete and metal in his room that amplify the sound.  Anytime inmates are speaking, everyone in the unit hears noise from the voices and the resulting echoes.

111.    Mr. Anderson is forced to eat every single meal in his cell alone within arm's reach of his toilet.

112.    Mr. Anderson's hands are shackled behind his back and at his legs anytime he leaves his cell.

113.    Even when seeing a doctor for blood-draws in the clinic, Mr. Anderson remains shackled.  One arm is taken from a shackle and attached to a metal hospital bed and the other is attached to an iron rod so the arm cannot bend.  In that position, CDOC doctors do their evaluations and tests on Mr. Anderson.

114.    Mr. Anderson only is allowed two phone calls a month for twenty minutes.  All of his non-legal calls are monitored.

115.    Mr. Anderson is only allowed to own two personal books at any time, which include religious texts.  These books can only be exchanged out once a year.

116.    The only way for Mr. Anderson to access legal documents is for him to tell CSP staff exactly the source or case he wants.  He has no way to perform his own research.

117.    CSP only provides the classes inmates must take to progress out of administrative segregation.  These classes are broadcast through the television and have no personal instruction component.  The teachers only collect and grade assignments.  There is no additional programming or education for inmates to participate in to improve their education or vocational skills to prepare them for participation in society.

118.    Mr. Anderson has seen each of the "classes" multiple times.

119.    Mr. Anderson is allowed to own only a limited amount of clothing.  Even though Mr. Anderson can send his clothes regularly to be washed at CSP, when the clothes return they are still dirty.  Mr. Anderson must rewash his clothes in the shower after being "laundered" by CSP to get them clean.

120.    Mr. Anderson's access to canteen items, including food and toiletries is extremely limited.  Mr. Anderson does not have access to healthier foods like tuna, peanut butter or soup, as prisoners in general population do.

121.    Mr. Anderson is also not allowed to purchase the same personal items that inmates can in general population such as radios, fans, sweatpants and tennis shoes.

122.    Mr. Anderson is allowed, at most, one hour a day, five days a week out of his cell to be used to shower and exercise in the indoor recreation room or "day hall" that provides.

123.    Furthermore, during prison lockdowns, Mr. Anderson cannot leave his cell at all.

124.    At times, Mr. Anderson goes days without leaving his cell.

125.    Prison guards at CSP use Oleoresin Capsicum Spray ("O.C. Spray") during involuntary inmate cell extractions.  O.C. Spray is a chemical agent that causes tears, pain, and temporary blindness.

126.    Because of his cooperation, Mr. Anderson has never been the subject of an O.C. Spray cell extraction.  However, when other inmates are extracted using the O.C. Spray, Mr. Anderson is forced to endure the tears, pain, and temporary blindness caused by indirect exposure to O.C. Spray throughout the unit.

127.    Mr. Anderson has grieved the issue of his exposure to O.C. spray.  In their response, CSP staff acknowledged that prisoners other than those who are the subject of the cell extractions are exposed to the O.C. Spray, but this process is still used and no protective action for the harms it causes "bystander" prisoners, such as masks, has been taken.

128.    Specifically, Mr. Anderson's request to not be exposed to the O.C. Spray during other inmates' cell extractions was denied because it would not be "a proper use of taxpayer money," according to a grievance response from CSP.  While CSP "regrets" that other individuals are harmed by this practice, they specifically find their policy and use of O.C. Spray to be "appropriate."

129.    While in administrative segregation, neither Mr. Anderson, nor any individual in CSP, is eligible to earn good time or earned time, which would reduce his sentence and shorten the time before he becomes parole eligible.

130.    Mr. Anderson's ineligibility for earned time is based solely on his placement in administrative segregation and does not reflect his behavior, which has been consistently positive since 2005, with no write-ups.  Mr. Anderson's incarceration is being prolonged based on Defendants' perception of possible behavior that is the result of his disability.

131.    Mr. Anderson is forced to endure significant hardships atypical of individuals placed in general population because of his classification and placement in CSP.

**F.    CSP refuses to provide outdoor exercise access.**

132.    Mr. Anderson has never been outside in the sun in the ten years he since he arrived at Colorado State Penitentiary.

133.     Mr. Anderson only receives exercise time in an indoor cell, known as the "day hall." This indoor cell has metal grates on the windows that are about five inches wide and three feet long.  A small amount of air passes through the holes in these grates.  The cell is approximately eight feet by twelve feet in size.  There is one pull-up bar in the cell for exercise purposes.

134.     The indoor cell provided for recreation does not have any windows that allow direct sunlight.

135.     Accordingly, for nearly a decade, Mr. Anderson has not felt or had sunlight hit his skin.

136.     Because of this, Mr. Anderson is not receiving any physical benefits of sunshine, and may suffer from Vitamin D deficiency as a result.

137.     At most, Mr. Anderson is allowed five hours a week of out-of-cell time, which includes time for showers in addition to his recreation.

138.     Often Mr. Anderson's recreation time is cancelled because CSP has been put in a "lockdown" or for other reasons.

139.     CSP uses these "lockdowns" for different reasons, including when there is an emergency at the prison, when there is a disturbance at the prison, and when there is a shortage of staff at the prison.

**G.      Defendants' arbitrary review process keeps Mr. Anderson in administrative segregation.**

140.     Although all inmates at CSP are housed in administrative segregation, according to CDOC policies, all inmates at CSP qualify to earn privileges, including stepping down to a lower security prison.

141.     The Quality of Life Level Program ("QLLP") is the program CSP uses to determine an inmate's privileges and ability to enter a step down program.

24

142.　　All inmates start at level one, which is the most restrictive level; individuals can progress to level five, which is the least restrictive.

143.　　As the levels increase so do the corresponding privileges, including benefits such as an increased number of visits and phone calls.

144.　　At level one, prisoners can make one phone call and can have one visitor per month.  In general, a prisoner will be held in level one for only a week.

145.　　At level two, inmates are allowed to have two visitors and make two phone calls a month.

146.　　At level three, inmates are allowed four visitors and four phone calls a month.

147.　　While in levels one through three, an inmate is not allowed contact with any other individuals.

148.　　After successful completion of level three, a prisoner is eligible to move into the Progressive Reintegration ("PRO") Unit.  To participate in the PRO unit, prisoners are moved to a different institution, the Centennial Correctional Facility ("CCF").

149.　　In the PRO Unit, the individual starts at level four and can progress with good behavior through level five.

150.　　Each level in the PRO Unit provides more opportunities for prisoners to be out of their cell and work with other prisoners.  Successful completion of the PRO Unit program makes an inmate eligible for placement into general population.

151.　　In order for Mr. Anderson, or anyone housed in CSP, to be eligible to move from administrative segregation and into the PRO Unit, he must maintain level three status for a minimum of three consecutive months.

152.    To move up to each level, a prisoner must be without any "incidents" for ninety days (excepting level one, where the review is after seven days).

153.    Mr. Anderson must track his own progress and request to be moved up a level when all criteria have been met, as Defendants frequently fail to keep accurate track of a prisoner's status. Currently, Mr. Anderson is on QLLP level two.

154.    Prisoners are not notified of the QLLP reviews, nor are they present at these reviews.

155.    The prison may adjust an inmate's QLLP level depending on whether the individual has had an "incident" within the review period.  An incident is generally when a prisoner is given a negative chron.

156.    A chron is a notation of any behavior, positive or negative, exhibited by a prisoner.

157.    Negative chrons can be entered for arbitrary behaviors such as "complaining" or "being non-responsive."

158.    Issuance of a chron is at the sole discretion of the prison staff.  Chrons may be used to either prohibit an inmate from moving on to the next level, or as a basis for removing a level already earned by the inmate.

159.    There is no mechanism for inmates to challenge the accuracy of a chron.

160.    When a negative chron is given, the prisoner does not receive any notice of the chron, and does not have any means to rebut the alleged behavior, nor to challenge what is stated by the CSP staff.

161.    The prisoner will usually not even be aware of the chron until his Administrative Classification Review ("Class Review").  The Class Review is used to determine whether

continued administrative segregation is appropriate for any inmate currently housed in administrative segregation.

162.    The chrons are also supposed to be recorded on a log called the "Chronlog."

163.    The last chron filed on Mr. Anderson's Chronlog Report was dated December 5, 2005.

164.    According to Mr. Anderson's Class Review, however, he has received negative chrons on 09/04/2009, 06/04/2009, 05/23/2009, 04/06/2008, 08/30/2007, 05/05/2007, 05/07/2007, 02/23/2007, 02/28/2007, 12/17/2006, and 12/26/2005.

165.    None of these were reported on Mr. Anderson's Chronlog report.  These chrons only appear on Mr. Anderson's Class Reviews, the document used to determine Mr. Anderson's retention in administrative segregation.

166.    According to Mr. Anderson's Class Review he has received negative chrons, and is being retained in administrative segregation, for incidents with no explanation other than "complaining to staff" or "bad attitude at count."

167.    CSP operational memoranda require information regarding behavior be limited to the "review period."  Mr. Anderson's Class Reviews are a review of the past 30 days.

168.    Despite this requirement, Mr. Anderson's Class Review dated March 2, 2009 refers to chrons received in 2007.  Thus, a chron Mr. Anderson received 19 months earlier was used, at least in part, as the basis for retaining Mr. Anderson in administrative segregation during his March 2, 2009 Class Review.

169.    Relying on chrons, in any capacity, to determine Mr. Anderson's proper placement bases the process on an arbitrary decision, and prevents Mr. Anderson from receiving a meaningful review.

170.     Mr. Anderson is not notified when a chron has been issued.  Unless Mr. Anderson requests the information from his case worker, he is not notified of a chron until his next Class Review.

171.     After learning of a chron, Mr. Anderson is not afforded a hearing regarding the chron or allowed to question the guards issuing the chron before it is used against him in his Class Review.  Mr. Anderson is not provided any opportunity to submit his own evidence that a chron has been given unfairly.

172.     Mr. Anderson is also not given notice of the Class Review, and is not permitted to attend this meeting or provide any input regarding whether he will be retained in isolation. Accordingly, he does not participate in any of the regular reviews concerning his status in administrative segregation.

173.     Mr. Anderson's only opportunity to challenge a chron is through the prison's grievance process.

174.     The grievance process is CSP's mandatory administrative procedure for dealing with prisoner complaints.  A prisoner must submit a form, identifying the issue, to his caseworker who then forwards it to the person charged with dealing with issues of the nature addressed in the grievance. The grievance process has three steps that allow the prison response times of 25 days, 25 days, and 45 days respectively.

175.     Having a chron expunged, via the grievance process, is only meaningful if Mr. Anderson remains chron-free during the grievance process.  If a subsequent chron was received during the grievance process, CSP would be able to keep Mr. Anderson from moving to the next QLLP

level on the basis of the new chron, regardless of whether the grieved chron is found to be a mistake and removed.

176.     If the prison took the full time to answer each step of his grievances about a chron, Mr. Anderson would be 95 days chron-free; five days more than the three month requirement to move up a level, making the grieved chron a moot point.

177.     Mr. Anderson has never heard of any instance where a chron was overturned or expunged from his or any other inmate's records.

178.     Mr. Anderson has not had a hearing for a violation of prison policies since May 12, 2005; however his QLLP and privileges have been adjusted based on chrons.

179.     CDOC can use chrons at their discretion to hold individuals like Mr. Anderson in administration segregation for as long as they deem necessary.  Earning privileges and access to step-down programs is a sham at CSP because the chron process allows prison officials to keep people in administration segregation indefinitely with no process for prisoners to appeal.

180.     Because of chrons, and related failure to provide meaningful review regarding continued placement at CSP, Mr. Anderson will not be eligible for parole until 2041.  If Mr. Anderson were not subject to such arbitrary processes and allowed to be in a general population facility, he could reduce the time necessary for parole by many years.

## <u>CAUSES OF ACTION</u>

FIRST CLAIM FOR RELIEF
Against Defendants Susan Jones and Aristedes W. Zavaras
The Classification and Review System, including the Use of Chrons, Violates Mr. Anderson's right to Due Process under the Fourteenth Amendment.
(42 U.S.C. § 1983 – Fourteenth Amendment Deprivation of Liberty Interest Without Due Process of Law)

181.    Mr. Anderson incorporates herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

182.    Mr. Anderson has a liberty interest in being free from the extreme and indefinite solitary confinement he has been subjected to over the past decade.  His continued confinement in such isolated and harsh conditions is an atypical and significant hardship, as compared to the ordinary incidents of prison life.

183.    Under the Fourteenth Amendment to the United States Constitution, Mr. Anderson may not be deprived of a liberty interest without due process of law.

184.    Defendants fail to provide any meaningful review process assessing why Mr. Anderson is held indefinitely in solitary confinement.

185.    Defendants' continued reliance on an arbitrary review system as a means to prevent Mr. Anderson from being placed in improved conditions fails to provide sufficient process to protect Mr. Anderson's liberty interest.

186.    Defendants' reliance on negative chrons to keep Mr. Anderson in solitary confinement creates an arbitrary process that fails to provide Mr. Anderson sufficient process.

187.    Defendants' failure to provide sufficient process, including any notice, hearing or opportunity to rebut evidence regarding Mr. Anderson's retention in isolation violates his right to due process.

SECOND CLAIM FOR RELIEF
Against Defendants Susan Jones and Aristedes W. Zavaras'
The Medication Request and Review Procedures Violate Mr. Anderson's right to Due Process under the Fourteenth Amendment.
(42 U.S.C. § 1983 – Fourteenth Amendment Deprivation of Liberty Interest Without Due Process of Law)

188.    Mr. Anderson incorporates herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

189.    Under the Fourteenth Amendment to the United States Constitution, Mr. Anderson may not be deprived of a liberty interest without due process of law.

190.    As a general matter, Defendants are required to provide necessary medical and mental health treatment for prisoners who are under their control.  Providing adequate medical and mental health care includes providing medications that are necessary for treatment of an illness or condition.  Prisoners in CDOC, and specifically in CSP, receive medications as ordered by their treating physicians.

191.    Prisoners who require non-formulary medications suffer an atypical and significant hardship compared to other prisoners, as they are not permitted adequate and appropriate treatment for their recognized condition.  They are not permitted this treatment even if the CSP physicians themselves order it.

192.    Whenever a CSP physician prescribes a non-formulary medication, the prescription goes through a review process before the prisoner is permitted to receive the medication.  This review process does not provide meaningful or sufficient procedural protections to ensure that necessary medications are not erroneously denied.

193.    Neither the prisoner nor the physician is permitted to speak before this Board.  The reasons for granting a prescription or denying it are not provided to the prisoner or the physician.

194.    There is no written basis produced explaining how or why non-formulary requests should be permitted or denied, leaving open the possibility that the decision is arbitrary, or based on bias, discrimination, or prejudice.

195.    Defendants' formulary procedures do not allow for inmates to challenge decisions rendered by the formulary review board.  All appeals must come from physicians who may exercise their own discretion as to whether an appeal will be made.

196.    Mr. Anderson was given no opportunity to appeal directly to the formulary review board and support his claim in violation of his right to due process.

THIRD CLAIM FOR RELIEF
Against Defendants Susan Jones and Aristedes W. Zavaras
Failure to provide adequate mental health treatment violated Mr. Anderson's Right to be Free of
Cruel and Unusual Punishment under the Eighth Amendment.
(42 U.S.C. § 1983 – Eighth Amendment Violation of Plaintiff's Right to be Free of Cruel and
Unusual Punishment)

197.    Mr. Anderson incorporates herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

198.    The Eighth Amendment to the United States Constitution forbids cruel and unusual punishment.  The Eighth Amendment prohibits deliberate indifference to serious medical needs of prisoners.

199.    The Defendants have violated Mr. Anderson's right to be free from cruel and unusual punishment by failing to provide Mr. Anderson with adequate mental health care, including but not limited to proper medication, access to prescribed medication, and by failure to properly test, diagnose, and treat Mr. Anderson.

200.    Mr. Anderson has an obvious serious medical need.  He has been diagnosed over his lifetime with serious mental health conditions that require treatment, including appropriate medications.

201.    Defendants are aware of Mr. Anderson's serious medical need, as his prison medical file contains diagnoses, and documents the need for further testing and prescription medications that have not been provided.

202.    Despite this knowledge, and even orders for treatment and medications, Defendants have acted with deliberate indifference to Mr. Anderson's serious mental health condition.

203.    Defendants' refusal to treat Mr. Anderson's mental health needs by not providing required testing, medications, and therapy, some of which were specifically ordered by CSP mental health staff, constitutes cruel and unusual punishment.

204.    Defendants' intentional denial and/or deliberate indifference to Mr. Anderson's serious mental health conditions is documented in his mental health records at CSP.  His condition impacts his behavior severely enough that his mental health condition is obvious even to non-medical correctional staff.

205.    Defendants' refusal to treat Mr. Anderson's mental health needs by providing diagnostic and neurological evaluations for a complete and accurate diagnosis of his mental health needs, as requested by CSP mental health staff, constitutes cruel and unusual punishment.

206.    Defendants' interference with Mr. Anderson's mental health assessment has caused Mr. Anderson additional harm including, weight loss, headaches, anxiety, sleep disturbances, depression and other psychological problems.

FOURTH CLAIM FOR RELIEF
Against Defendants Susan Jones and Aristedes W. Zavaras
Denial of Outdoor Exercise Violates of Mr. Anderson's right to be Free of Cruel and Unusual Punishment under the Eighth Amendment.
(42 U.S.C. § 1983 – Eighth Amendment Violation of Plaintiff's Right to be Free of Cruel and Unusual Punishment)

207.     Mr. Anderson incorporates herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

208.     The Eighth Amendment to the United States Constitution forbids cruel and unusual punishment.

209.     Defendants have contained Mr. Anderson indoors without access to fresh air and sunlight for nearly ten years.

210.     Defendants' deliberate and intentional actions place Mr. Anderson's physical and mental health at serious risk.

211.     Even though Defendants are aware of this risk, as it has been ordered in other cases that such exercise is illegal, unconstitutional, and dangerous, Defendants have failed to improve their conditions, or provide Mr. Anderson – or any prisoner at CSP – access to sunlight or fresh air.

212.     The denial of outdoor exercise also is an excessive and disproportionate punishment that constitutes cruel and unusual punishment.

FIFTH CLAIM FOR RELIEF
Against all Defendants
Discrimination on the Basis of Mr. Anderson's Disability in Violation of the Americans With Disabilities Act.
(42 U.S.C.S. § 12101 – Violation of ADA)

213.     Mr. Anderson incorporates herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

214.     Mr. Anderson is an individual with a mental impairment, a record of such an impairment, and regarded as having such impairment within the meaning of 42 U.S.C. § 12102, as his serious mental illnesses constitute mental impairments that substantially limit him in several major life activities, including but not limited to learning, concentrating, thinking and interacting with

others.  These limitations on his life activities have had a profound effect on Mr. Anderson's life as fully described above.

215.    As an inmate in the custody of CDOC, Mr. Anderson is qualified for the programs, activities, aids, benefits, and services offered by CDOC.

216.    Mr. Anderson, with or without reasonable modifications to rules, policies or practices, met and continues to meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants.  Thus, Mr. Anderson is a "qualified individual with disabilities" within the meaning of the ADA, 42 U.S.C. § 12131(2).

217.    Defendants are public entities as that term is used in 42 U.S.C. § 12131.

218.    "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. 12132.

219.    Defendants have discriminated against Mr. Anderson on the basis of disability in violation of 42 U.S.C. § 12132 and its implementing regulations as more fully described above.

220.    Such discrimination includes but is not limited to exclusion of Mr. Anderson from services and programs accorded to prisoners on the basis of his disability.  Defendants have also failed to make reasonable accommodations and modifications to policies, practices, procedures for Mr. Anderson.

221.    Defendants' discrimination is intentional and/or represents deliberate indifference to the strong likelihood that pursuit of the actions and policies at issue in this Complaint would likely result in a violation of federally protected rights.

222.    Mr. Anderson has been injured and aggrieved by and will continue to be injured and

aggrieved by Defendants' discrimination.

SIXTH CLAIM FOR RELIEF
Against Defendant CDOC
Discrimination on the Basis of Mr. Anderson's Disability in Violation of the Rehabilitation Act.
(29 U.S.C.S. § 794 – Violation of Rehabilitation Act)

223.    Mr. Anderson incorporates herein by reference all other paragraphs of this complaint as if

those allegations were set out explicitly herein.

224.    "No otherwise qualified individual with a disability in the United States, as defined in

section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance."  29 U.S.C. § 794.

225.    Defendants receive and benefit from federal financial assistance as that term is used in 29

U.S.C. § 794 through the Prison Rape Elimination Act and other sources.

226.    Mr. Anderson is an individual with a mental impairment, a record of such an impairment,

and regarded as having such impairment within the meaning of 42 U.S.C. § 12102 (as

incorporated into 29 U.S.C. § 705(b)(9)(B)), as his serious mental illnesses constitute mental

impairments that substantially limit him in several major life activities, including but not limited

to learning, concentrating, thinking and interacting with others.  These limitations on his life

activities have had a profound effect on Mr. Anderson's life as fully described above.

227.    As an inmate in the custody of CDOC, Mr. Anderson is qualified for the programs,

activities, aids, benefits, and services offered by CDOC.

228.    Mr. Anderson, with or without reasonable modifications to rules, policies or practices,

met and continues to meet the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by Defendants.  Thus, Mr. Anderson is a

"qualified handicapped person" within the meaning of the Rehabilitation Act.  *See, e.g.,* 28

C.F.R. § 41.32(b).

229.    Defendants have discriminated against Mr. Anderson on the basis of disability in

violation of 29 U.S.C. § 794 and its implementing regulations as more fully described above.

230.    Such discrimination includes but is not limited to exclusion of Mr. Anderson from

services and programs accorded to prisoners on the basis of his disability.  Defendants have also

failed to make reasonable accommodations and modifications to policies, practices, procedures

for Mr. Anderson.

231.    Defendants' discrimination is intentional and/or represents deliberate indifference to the

strong likelihood that pursuit of the actions and policies at issue in this Complaint would likely

result in a violation of federally protected rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

A.      A declaration that Mr. Anderson has been and is being deprived by Defendants of his

        right to be free from cruel and unusual punishment in violation and contravention of the

        Eighth Amendment of the United States Constitution;

B.      A declaration that Mr. Anderson has been and is being deprived by Defendants of his

        right to due process in violation and contravention of the Fourteenth Amendment of the

        United States Constitution by not providing Mr. Anderson with a meaningful review of

        his continued placement in extreme conditions that result in an atypical and significant

        hardship;

C.     A declaration that Mr. Anderson has been and is being deprived by Defendants of his

right to due process in violation and contravention of the Fourteenth Amendment of the

United States Constitution by not providing meaningful review of the denial of necessary

medical treatment through the formulary process;

D.     A declaration that Mr. Anderson has been and is being deprived by Defendants of his

right to be free of discrimination on the basis of disability under the Americans with

Disabilities Act and Rehabilitation Act by Defendants exclusion and segregation on the

basis of disability and refusal to make reasonable modifications to policies, practices and

procedures necessary to avoid such discrimination;

E.     An injunction requiring Defendants to comply with the Eighth Amendment and the Due

Process Clause of the United State Constitution, the Americans with Disabilities Act, and

the Rehabilitation Act, including but not limited to:

1.     providing access to outdoor exercise that allows Mr. Anderson regular access to

fresh air and sunlight, including time outside of the prison buildings;

2.     providing adequate and meaningful review of Mr. Anderson's continued retention

in extreme conditions, including ceasing to rely on the current chron system, and

providing all procedural protections necessary to ensure Mr. Anderson is not

erroneously placed or retained in administrative segregation generally or in any of

the QLLP levels;

3.     providing adequate process and procedures to ensure that Mr. Anderson is not

erroneously deprived of necessary medications;

4.     requiring proper diagnosis and treatment of Mr. Anderson's mental illness

including all prescribed medications and therapy and requiring transfer out of administrative segregation to SCCF or another appropriate facility;

5. providing Mr. Anderson the proper medications to accommodate his mental health disabilities as deemed appropriate through further testing, including but not limited to prescribed medications not on the CDOC drug formulary;

6. placing Mr. Anderson in an appropriate step-down program, including providing him with individualized planning within the program to allow him to progress to a lower custody level that considers his mental disabilities;

7. modifying their administrative segregation privilege and incentive policies to prevent Defendants from punishing Mr. Anderson due to his disability;

8. awarding Mr. Anderson any earned or good time credits toward his sentence that he has been denied in violation of the law, and moving up his eligibility date for parole and release from prison accordingly; and

9. requiring Defendants to report to this Court for review of the adequacy of the programs, changes to procedures and responses implemented in response to this Court's direction.

F. An award of attorneys' fees and costs of this action, including expert witness fees, on all claims allowed by law;

G. An award of compensatory damages for violation of the Rehabilitation Act, 29 U.S.C.S. § 794; and

H. Any additional or alternative relief as may be just, proper and equitable.

Dated:  May 3, 2010

Respectfully submitted,

s/  Brittany Glidden
Student Law Office
Brittany Glidden
Laura L. Rovner
Ashley Wheeland, Student Attorney
Patrick Curnalia, Student Attorney
University of Denver Sturm College of Law
2255 E. Evans Ave.
Denver, CO, 80208
Ph:  303-871-6140
Fax:  303-871-6847
Email:  bglidden@law.du.edu

s/  Amy F. Robertson
Fox & Robertson, P.C.
104 Broadway, Suite 400
Denver, CO 80203
Ph: 303-595-9700
Fax: 303-595-9705
Email:  arob@foxrob.com