IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 10-cv-01005-RBJ-KMT

TROY ANDERSON,

Plaintiff,

v.

STATE OF COLORADO, DEPARTMENT OF CORRECTIONS,
SUSAN JONES, in her official capacity as warden of the Colorado State Penitentiary, and
ARISTEDES W. ZAVARAS, in his official capacity as the Executive Director of the Colorado
Department of Corrections,

Defendants.

---

## Final Order and Judgment

---

This case was tried to the Court between April 30 and May 8, 2012. The Court left the record open through May 25, 2012 so that the parties could address a new regulation, scheduled to be issued by the Colorado Department of Corrections ("CDOC") shortly after the trial, that potentially would address some of the plaintiff's concerns. The Court now issues its findings of fact, conclusions of law, and order of judgment.

### FACTS

Troy Anderson has been an inmate in the CDOC all but three years since 1991. While serving his first sentence, he was placed in "administrative segregation" because, in his words, he became "very disruptive." Administrative segregation is the most restrictive custody level imposed within the CDOC. It is not punitive segregation. Rather, it is reserved for inmates who are considered to be threats to prison employees, other inmates, or prison security. In 1993 the CDOC opened the Colorado State Penitentiary ("CSP") in Canon City, Colorado. The CSP is

1

Colorado's highest security "supermax" facility.  Until recently, all inmates there were in administrative segregation.  Mr. Anderson remained at the CSP until his release from prison in 1997.

In 2000 he was returned to prison, this time on an 83-year sentence with a parole eligibility date of June 5, 2041.  Because he presently is 42 years of age, there is a good chance that he will spend the rest of his life in prison.  Mr. Anderson was again assigned to the CSP and placed in administrative segregation, this time because his crimes included two shoot outs with police during escape attempts.  He has remained in administrative segregation at the CSP since he returned.

In administrative segregation at the CSP, each offender is housed in a single cell approximately 90 square feet in size.  Defendants' Exhibit 10 (diagram).  The cell contains a metal bed, desk, toilet and three shelves.  There is small vertical glass window that admits light but which, because of its placement in relation to the bed, desk and shelving, is difficult to access to look out.  A light in the cell is left on 24 hours a day.  The inmates' daily existence is one of extreme isolation.  They remain in their cells at least 23 hours a day.  The cells were designed in a manner that discourages and largely restricts vocal communication between cells.  According to inmate David Bueno, he can hear other people yelling and screaming but not conversations.  All meals are passed through a slot in the cell door to the inmate.  The inmates have little human contact except with prison staff and limited opportunities for visitors, depending on the inmate's level of privileges as will be discussed later.

In theory the inmate is removed from his cell for about one to one and one-quarter hours five times each week.  On these occasions the inmate is taken to an approximately 90 square foot, oddly shaped interior "recreation" room.  *See* Plaintiff's Exhibit 348 (photographs).  This

room is empty except for a chin-up bar.  It has two vertical "windows," approximately five feet by six inches in size, which are not glassed but instead are covered with metal grates.  The grates have holes approximately the size of a quarter that open to the outside.  The inmate can see through the holes, can sometimes feel a breeze, and can sometimes feel the warmth of the sun.  This is his only exposure of any kind to fresh air.  After approximately 60 minutes in this room, the inmate is permitted to shower and then is returned to his cell.  According to Mr. Anderson and other inmates who testified, in practice the number of opportunities to go to this "exercise" room is sometimes fewer because of lockdowns or other reasons, and missed times are not made up.

With the exception of approximately one month in 2001 when Mr. Anderson was taken to another CDOC facility for a mental health evaluation, and then his transport to and from the courthouse for his trial in this case, he has not been out of doors in 12 years.  He has not, therefore, had any opportunity for outdoor exercise.  Unless the inmate is able to earn his way out of administrative segregation, his stay in administrative segregation can be indefinite.  At the present time there are nine offenders, including Mr. Anderson, who have been in administrative segregation at the CSP for more than 10 years.

Mr. Anderson does not request that he be removed from administrative segregation at this time.  Like many prisoners in Colorado and elsewhere, Mr. Anderson suffers from mental illness.  He does not believe that his mental illness has been properly treated, and he fears that until it is, he might be a danger to himself or others.  Several CDOC employees likewise expressed the opinion that, at this time, he remains too much of a security risk to progress out of administrative segregation.  Rather, Mr. Anderson and the team of lawyers representing him have tackled certain policies and procedures at the CSP that they contend have adversely affected his mental

health and that have prevented him from taking advantage of the opportunities that the CSP

provides to progress out of administrative segregation.

Mr. Anderson sued the CDOC; Susan Jones, the Warden of the CSP when the suit was

filed; and Aristedes W. Zavaras, then the Executive Director of the CDOC.  Ms. Jones and Mr.

Zavaras are named in their official capacities, and because neither of those individuals presently

holds those positions, the suit more properly is against the present holders of those positions.  In

any event, suits against prison officials in their official capacities are in substance suits against

the CDOC.

The Complaint initially asserted six claims for relief.  Claims One through Four named

the two prison officials in their official capacities.  Claims Five and Six named all defendants.

The second claim has since been dismissed.  The remaining claims, by claim number, assert (1) a

due process violation arising from the use of an unfair system to evaluate Mr. Anderson's behavior

for purposes of earning privileges and ultimately progressing out of administrative segregation; (3)

cruel and unusual punishment in the form of inadequate mental health treatment; (4) cruel and

unusual punishment by denial of any opportunity for outdoor exercise; (5) violation of the Americans

with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., by denying him access to certain

programs and benefits because of his mental health issues; and (6) violation of the section 504 of the

Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978

("Rehabilitation Act"), 29 U.S.C. § 794, for the same reason.

Instead of treating these claims in that order, however, I will organize the remainder of

this opinion around the three central targets of the Complaint; (1) denial of access to the out of

doors and outdoor exercise; (2) mental health treatment; and (3) barriers to progression out of

administrative segregation.

**CONCLUSIONS**

I.  **OUTDOOR ACCESS AND EXERCISE**.

Mr. Anderson contends that denial of any opportunity to be outside and to have outdoor exercise during the 12 years he has been held in administrative segregation constitutes cruel and unusual punishment contrary to the Eighth Amendment, which is applicable to the States through the Fourteenth Amendment.  I agree.

The Eighth Amendment does not mandate comfortable prisons, but it does forbid inhumane conditions.  *Farmer v. Brennan,* 511 U.S. 825, 832 (1994).  If (1) treatment of an inmate is, objectively, a "sufficiently serious" deprivation of rights, and (2) prison officials have, subjectively, a "sufficiently culpable state of mind," the Eighth Amendment has been violated. *Id.* at 834 (internal citations omitted).

    A.  **Was the deprivation "Sufficiently Serious"?**

A prison condition is sufficiently serious if it denies the inmate "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981).  This Court concludes that denial of any opportunity to be outdoors and to engage in some form of outdoor exercise for a period of 12 years is a serious deprivation of a human need, according to the evidence in this case and according to any reasonable concept of what constitute the civilized measure of life's necessities.

Plaintiff's medical expert Raymond Patterson, M.D., a psychiatrist who has spent much of his impressive career in and around prisons, and who frequently serves as a consultant and expert on prison conditions, testified that every prison he has visited except the CSP provides some opportunity for outdoor exercise, even to death row inmates.  It is important, he believes, to

a person's mental health.  He is not alone.  Eight clinical employees of the CDOC testified

during this trial: Paula Frantz, M.D., a family and emergency medicine specialist who serves as

the Chief Medical Officer for the CDOC; Darren Lish, M.D., the current Chief of Psychiatry for

the CDOCV; Joan Koprivnikar, M.D., one of Mr. Anderson's former treating psychiatrists and

the CDOC; and five psychologists, Drs. James Michaud (CDOC's current Mental Health

Administrator); Peggy Steel, Vicky Tuakoi, Jill Lampela and Erin Lenocker.  Every one of these

CDOC professionals who was asked about outdoor exercise agreed with Dr. Patterson.  Dr.

Koprivnikar, for example, described outdoor exercise as being "extremely important" for the

mood, sleep and overall wellbeing of an individual.  Dr. Steele testified that it is unfortunate that

Mr. Anderson cannot go outside, because outdoor exercise is good for everyone.  She added that

it is difficult to get any exercise at the CSP.

    In 1987 the Tenth Circuit considered the case of an individual who was sentenced to a

Wyoming state prison for first degree murder, then transferred at his request to a Minnesota

prison, and then returned to the Wyoming prison after murdering an inmate in Minnesota.  *Bailey*

*v. Shillinger,* 828 F.2d 651 (10th Cir. 1987).  The court in a per curium opinion agreed that

placement of that inmate in segregation was appropriate.  However, the inmate complained that

he was being denied exercise and fresh air.  The court commented, "[t]here is substantial

agreement among the cases in this area that some form of regular outdoor exercise is extremely

important to the psychological and physical wellbeing of inmates, and some courts have held a

denial of fresh air and exercise to be cruel and unusual punishment under certain circumstances."

*Id.* at 653.  In that instance the prison had constructed an outdoor exercise facility after the

inmate filed suit, and he was allowed to use it for one hour per week.  The Court held, "[a]though

this amount of exposure to exercise and fresh air is still restrictive, we cannot say, without more,

that it fails to satisfy the demands of the Eighth Amendment." *Id. See also Perkins v. Kansas Department of Corrections,* 165 F.3d 803, 810 (10th Cir. 1999)(a prisoner who was denied outdoor exercise for nine months stated a claim for violation of the Eighth Amendment on which relief could be granted).

One case cited by the court in *Bailey* was *Spain v. Procunier,* 600 F.2d 189 (9th Cir. 1979). Six prisoners who were considered to be among the most dangerous in the California state prison at San Quentin were housed in a maximum security segregation unit for four years with no indication as to when they would be released. They were permitted to exercise one at a time in an indoor corridor one hour per day, five days per week, although in practice the exercise opportunities were less frequent. The trial court found that the denial of fresh air and regular outdoor exercise constituted cruel and unusual punishment and ordered defendants to give plaintiffs the right to engage in outdoor exercise one hour per day, five days a week unless inclement weather, unusual circumstances, or disciplinary needs made that impossible. The circuit affirmed, stating "we do not consider it necessary to decide whether deprivation of outdoor exercise is a per se violation of the eighth amendment. Our ruling, and that of the district court, applies to these plaintiffs who were assigned to the [segregation unit] for a period of years." *Id.* at 199. The court acknowledged the prison's arguments that outdoor exercise was withheld to protect prison staff and other inmates from violence, to protect plaintiffs from violence, and to reduce the risk of escape. However, "[t]hese concerns justify not permitting plaintiffs to mingle with the general population but do not explain why other exercise arrangements were not made. The cost or inconvenience of providing adequate facilities is not a defense to the imposition of a cruel punishment." *Id.* at 200.

More recent panels of the Ninth Circuit have indicated that denials of outdoor exercise for 14 months, *Thomas v. Ponder,* 611 F.3d 1144, 1151 (9th Cir. 2010), and even six weeks, *Lopez v. Smith,* 203 F.3d 1122, 1133 (9th Cir. 2000), can be sufficient to support an Eighth Amendment claim.  Other courts outside the Ninth Circuit holding that long-term denial of outdoor exercise constitutes cruel and unusual punishment include *Rhem v. Malcolm,* 371 F. Supp. 594, 627 (S.D.N.Y. 1974) and *Sinclair v. Henderson,* 331 F. Supp. 1123, 1131 (E.D. La. 1971).  *But see Bass v. Perrin,* 170 F.3d 1312, 1317 (11th Cir. 1999)(placement of inmates on "Yard Suspension List" so that they could not enjoy the privilege of two hours per week of outdoor exercise privilege did not violate the Eighth Amendment where is was done for disciplinary reasons based on clear and compelling facts; the discipline was for possession of homemade firearms and handcuff keys, stabbing another inmate, commandeering a dump truck at knife point in an escape attempt, and murdering a correctional officer).

The present case exceeds all of these cases in terms of the potential for serious harm.  Mr. Anderson is a mentally ill inmate.  He has been deprived of any form of outdoor exercise, and virtually any meaningful exposure to fresh air, for 12 years.  Nothing was presented in the evidence of this case to suggest that the end is in sight.  Coupled with the other conditions of administrative segregation at the CSP, this prolonged deprivation is a paradigm of inhumane treatment.

## B.  Have Defendants Been "Deliberately Indifferent" to Mr. Anderson's Health?

As indicated above, in addition to showing that the deprivation is sufficiently serious, plaintiff must establish that prison officials had a "sufficiently culpable state of mind," namely, that they were "deliberately indifferent" to the inmate's health or safety.  *Farmer,* 511 U.S. at 834.  Under that standard, "a prison official cannot be found liable under the Eighth Amendment

for denying an inmate humane conditions of confinement unless the official knows of and

disregards an excessive risk to inmate health or safety; the official must both be aware of facts

from which the inference could be drawn that a substantial risk of harm exists, and he must also

draw the inference." *Id.* at 837.

The CSP facility was built between 1990 and 1993.  Thus, construction started three

years after the Tenth Circuit recognized that "regular outdoor exercise is extremely important to

the psychological and physical well being of inmates," *Bailey,* 828 F.2d at 653, and 11 years

after the Ninth Circuit held that depriving segregated inmates outdoor exercise for more than

four years constituted cruel and unusual punishment. *Spain,* 600 F.2d at 200.  Whether CDOC

officials were aware of those decisions or similar decisions of other courts at that time is

unknown to me.

I do, however, assume that CDOC officials were aware then, but if not then, that they are

certainly on notice now, of what other supermax facilities have done to provide outdoor exercise

to segregated inmates.  Plaintiff's corrections expert, Steven Martin, who has more than 40 years

of hands-on and consulting experience in corrections, including "supermax" facilities in five

states, testified that to the best of his knowledge the CSP is the only supermax facility in the

country, including the notorious federal supermax prison at Florence, Colorado, that does not

provide some opportunity for outdoor exercise.  In Mr. Martin's opinion, prolonged denial of

outdoor exercise has no valid penological justification.  Dr. Patterson, the plaintiff's medical

expert, likewise testified that he is unaware of any other supermax type prison that does not

provide outdoor exercise opportunities for their inmates.

As indicated above, CDOC clinical personnel acknowledged during the trial that outdoor

exercise is very important.  The CDOC's facilities in Sterling and San Carlos, Colorado, the

latter of which houses many mentally ill inmates, provide outdoor exercise for all inmates including those in administrative segregation.

In February 2010 the American Bar Association adopted standards for the treatment of prisoners. Standard 23-3.6(b) recommended that "[e]ach prisoner, including those in segregated housing, should be offered the opportunity for at least one hour per day of exercise, in the open air if weather permits." Plaintiff's Exhibit 250 at Bates # DUN000334. Those standards are not, of course, binding on the CDOC. On February 1, 2011 CDOC issued Administrative Regulation 1000-01, which states that it is the policy of the CDOC "to ensure all facilities provide a comprehensive recreation program that includes leisure-time activities, outdoor exercise [4-4481] and recreation activities appropriate to the offenders…." Plaintiff's Exhibit 51 at Bates #P002525. The reference "4-4481" is to an American Correction Association policy applicable to prisons in general, not specifically to administrative segregation.

However, in 2011 the CDOC commissioned a study of its administrative segregation policies by the Prison Division of the National Institute of Corrections. The resulting report, admitted as Plaintiff's Exhibit 404, was issued in October 2011. It is sometimes referred to as the "Austin-Sparkman" report, after its two authors. The authors found that outdoor recreation was deficient at the CSP and other CDOC facilities with administrative segregation units except at Sterling and San Carlos. *Id.* at 18.

The CSP itself was designed with a central open-air courtyard that could be used for outdoor exercise. However, the inmates in administrative segregation have never been allowed to use it. When 126 medium security offenders were brought in to occupy empty cells earlier this year, they were permitted to use it. The CSP also has provided a location on the north side of its building for outdoor use by medium security offenders. Warden Jones testified that the

open-air courtyard, particularly after certain modifications that have been made, is sufficiently secure for use by any inmates at CSP.  However, she does not recommend that inmates in administrative segregation should be permitted to use the open-air courtyard because of current budget and staffing issues.  She does not believe that the other outdoor exercise area is sufficiently secure for administrative segregation inmates at this time.

Larry Reid, Deputy Director of Prison Operations and a former warden at the CSP, helped to develop the administrative segregation policies.  He testified that CSP was touted as the best supermax prison in the industry when it became operational in 1993.  In his view, the indoor exercise rooms provided to inmates in administrative segregation at the CSP provide "a lot of opportunities for exercising."  Inmates can do calisthenics, and isometrics against the wall, and they can talk through the grate openings to people outside.  These rooms, Mr. Reid says, provide an "outdoor environment inside the facility," including fresh air, panoramic view, and access to the elements.  He adds that inmates get to go outside when they are taken to a hospital or other places, apparently like a trip to the courthouse.

The fact that this highly experienced senior official in the CDOC believes that a tiny indoor room with a chin-up bar and a grate with small openings to the outside provides an "outdoor environment" and "lots of opportunities for exercising," and that it is ok for Mr. Anderson to be confined without outdoor exercise or any real exposure to fresh air and the out of doors for 12 years and counting, is troubling, to say the least.  The clinical personnel who are charged with providing mental health care to inmates at the CSP know better.  CDOC officials know that the CSP is out of step with the rest of the nation.  They have been told by the experts whom they hired that access to outdoor recreation at the CSP is deficient.  However, so far as the evidence in this case shows, nothing has been done to provide any form of outdoor exercise to

Mr. Anderson or to other inmates who have been held in administrative segregation at the CSP for long periods.  The Court concludes that defendants have been deliberately indifferent to Mr. Anderson's mental and his physical health.

Accordingly, plaintiff has proven, to a preponderance of the evidence, that failure to provide reasonable access to the out of doors and outdoor exercise to Mr. Anderson constitutes cruel and unusual punishment in violation of the Eighth Amendment.

## II.    MENTAL HEALTH TREATMENT.

The Eighth Amendment's obligation to provide for prisoners' minimal life necessities includes a requirement to provide access to adequate medical care, including mental health care. *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir. 1980).  *See generally Brown v. Plata,* 131 S.Ct. 1919 (2011).  Inmates cannot provide for their own medical care, and denial of needed care for any significant condition is "sufficiently serious."  Prison officials are deliberately indifferent if they know that an inmate faces a substantial risk of serious harm but do not take reasonable measures to abate it.  *Farmer,* 511 U.S. at 847.  "[W]hen incarceration deprives a person of reasonably necessary medical care (including psychiatric or mental health care) which would be available to him or her if not incarcerated, the prison authorities must provide such surrogate care."  *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir. 1989).

Mr. Anderson contends that he has been unconstitutionally denied adequate access to mental health care in two respects.  First, he has not been prescribed medication that he contends he needs and that would be available to him if he were not incarcerated.  Second, he contends that he cannot receive effective treatment unless it is provided by a multidisciplinary treatment team.

Mr. Anderson also contends that the denial of appropriate mental health care violates Title II of the ADA, 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The elements of the two federal statutes are essentially the same for present purposes. Plaintiff must show that "(1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas County Sheriff's Dep't,* 500 F. 3d 1185, 1193 (10th Cir. 2007).

Because of his mental illness, Mr. Anderson is a qualified person with a disability. There are two programs at the CSP that offer increased privileges and potentially a means to progress out of administrative segregation based upon good behavior: the Quality of Life Level Program or "QLLP" (now apparently called "Progressive Management"), which is available to all administrative segregation inmates; and the Offenders with Mental Illness or "OMI" program, which has been specially created for inmates with mental illness. Mr. Anderson contends that he has been denied some of the benefits of the QLLP program, and has been unable to participate in and therefore has been denied the benefits of the OMI program. He further contends that his inability to obtain these benefits has been by reason of his disability, because without effective mental health care (stimulant medication and a multidisciplinary treatment team) he cannot control behaviors that have limited his progression in the QLLP program and have caused him to be removed from the OMI program.

**A. <u>Has Mr. Anderson Been Denied Necessary and Appropriate Medication</u>?**

The various health care professionals who testified agree that Mr. Anderson suffers from antisocial personality disorder and attention deficit hyperactivity disorder ("ADHD"). They have somewhat different opinions regarding which of these is his primary diagnosis. They do agree

that "stimulants," such as Ritalin (methylphenidate hydrochloride), are the most effective

medications for the treatment of ADHD.

However, no physician at the CDOC has prescribed Ritalin or any other stimulant for Mr.

Anderson.  There are arguably two reasons for that.  First, stimulants are not included in the

CSP's or the CDOC's statewide medication "formulary," which is a list of medications that

CDOC physicians can prescribe without special permission.  Second, at least some of CDOC's

clinical personnel who are familiar with Mr. Anderson believe that stimulants are inappropriate

for him.

The reason Ritalin and other stimulants are not on the formulary, at least in large part, is

their susceptibility to abuse, that is, susceptibility to being hoarded, traded, sold, or given,

voluntarily or involuntarily, to an inmate for whom the medication was not prescribed.  The

decision whether to place a particular medication on the formulary is well within the discretion

that prison officials have to administer their prisons without judicial interference.  However, a

prison may not use general concern about a drug's abuse potential as an excuse for denying a

particular prisoner medication that he needs.

CSP, like other prisons, reduces abuse potential by crushing pills, floating them in liquid,

and observing the inmate consume them.  Determined inmates still can and do secrete medicines,

such as by "cheeking" pieces and trapping pieces in their gums.  Nevertheless, medications with

high abuse potential are prescribed at the CSP.  Effexor and Wellbutrin, both of which are known

to be subjects of abuse, are on the formulary and have been prescribed for Mr. Anderson.  Two

CDOC inmates, one an adult and the other a juvenile, currently receive Ritalin, even though it is

not on the formulary.  Inmate Carlos Mondragon testified that he was prescribed Ritalin for

ADHD when he was in the Buena Vista facility.  According to Dr. Patterson, stimulants are

provided where necessary and appropriate in other high security prisons.  With the exception of one note about Mr. Anderson's "cheeking" medications, there is no evidence that Mr. Anderson has abused any of the many medications that have been prescribed for him during his years at the CSP.  Dr. Lish acknowledged that he does not think that Mr. Anderson is planning to abuse a stimulant medication if he receives one.

Whether Ritalin or other stimulants are appropriate for him is a more difficult question. Dr. Patterson believes that a stimulant, or at least Strattera (atomoxetine) which is the only non-stimulant approved by the FDA for treatment of ADHD, should be prescribed.  However, Dr. Koprivnikar, who served as a treating psychiatrist for Mr. Anderson for four to five months in 2010 and 2011 at the CSP, does not believe that a stimulant is appropriate.  She also noted that it would not address behaviors arising from antisocial personality disorder.

Another significant problem is that Mr. Anderson was addicted to methamphetamine before he was incarcerated.  Dr. Lish expressed concern about prescribing a stimulant for someone with a prior addiction that is "basically the same as what he was addicted to." Plaintiff's attorneys argue that Mr. Anderson would likely be prescribed a stimulant if he were not incarcerated and cites, among other things, the CDOC's Mission Statement which commits to providing health care comparable to that of the community.  Plaintiff's Exhibit 217 at Bates #P002689.  A more apt comparison might be between incarcerated and non-incarcerated individuals who have a history of meth addiction.

An even more fundamental problem with Mr. Anderson's quest for a stimulant is that courts do not prescribe medication.  Courts are not in a position to second guess the medical judgment of a physician.  Recognizing that problem, plaintiff's attorneys propose that the Court order defendants to develop a treatment plan.  The proposal [in docket #102] lists 10 different

things that the plan must take into account. *Id.* at 4-5.  This proposal too comes dangerously close to having the Court dictate what CDOC's physicians and other clinical personnel must do.

Moreover, the proposed order provides that if plaintiff is not satisfied with defendants' plan, he may require that it be reviewed by an independent psychiatrist jointly selected by the parties.  Given Mr. Anderson's fixation on obtaining stimulant medication, it is likely that he will be dissatisfied with any plan that does not include a stimulant prescription.  This Court is not prepared to take medical judgments out of the hands of the psychiatrists who work at the CDOC and turn those judgments over to an "independent psychiatrist."  The Court was impressed with the qualifications and competence of the CDOC physicians who testified, and it has no reason to suspect that other CDOC psychiatrists are any less capable.

One thing that is reasonably clear, however, is that the psychiatrists at the CDOC have tried nearly everything else.  Mr. Anderson has been prescribed Effexor, Desipramine and Wellbutrin for treatment of symptoms associated with ADHD.  These are not stimulants.  They are not FDA approved for the treatment of ADHD.  These "off-label" drugs apparently have benefits for some ADHD patients.  However, Dr. Patterson testified that they have not been effective for Mr. Anderson.  Whether or not they have provided some benefit to him, the behaviors that have held him back – primarily threating and abusive language and disruptive conduct – have continued, even to the point that, as discussed below, he was removed from the program specially designed for mentally ill inmates because of his conduct.

The Court lacks the expertise to know whether Mr. Anderson's continuing behavior issues can be attributed to the lack of the "right" medication.  This was not proven by a preponderance of the evidence, and therefore, the Court does not find that he has established his ADA or his Rehabilitation Act claim.  However, at the conclusion of his testimony I put this

16

question to Dr. Lish, who as indicated above is the Chief of Psychiatry for the CDOC: are we at

a point where giving a stimulant a try might make sense?  He responded that it was a legitimate

question, and that stimulants should be considered, but that they would not change Mr.

Anderson's antisocial personality disorder.  He testified that he would not object to Mr.

Anderson's receiving Ritalin if that is the decision of his "treatment team," although he said that

he personally would try Strattera before he would try Ritalin.  I also note that, as of the time of

the trial, there was no specific psychiatrist treating Mr. Anderson.  He was, as far as I could tell,

"between doctors" (psychiatrists) at that time.

Accordingly, because Mr. Anderson is absolutely entitled to necessary and effective

mental health care under the Eighth Amendment, the Court is willing to go this far.  Defendants

are directed to assign a CDOC psychiatrist, either Dr. Lish or someone he designates, to re-

evaluate Mr. Anderson's current mental health treatment needs.  Preferably, though not

necessarily, this will be a physician who has not already formed an opinion regarding the

appropriate medication regimen for him.  This physician will meet with Mr. Anderson, conduct

an appropriate examination, consult with Mr. Anderson's current treatment provider

(psychologist), conduct an appropriate review of Mr. Anderson's medical records, and take

whatever steps he or she concludes are appropriate in his or her medical judgment.  This may or

may not include any medication change.

The only restriction this Court will place is that the fact that a particular medication is not

on the formulary should not be dispositive.  Denial of an appropriate and necessary medication

based on the possibility that Mr. Anderson would abuse it by allowing other inmates to consume

it, where there is essentially no history that he has abused medication in that manner during his

years in administrative segregation, and where "crush and float" and other procedures can be

taken to minimize any potential abuse, would constitute deliberate indifference to a serious need and would violate the Eighth Amendment.  If the physician concludes that a non-formulary medication is appropriate, he or she should apply to the formulary committee for authority to prescribe the medication.  The Court will not second guess the decision of the formulary committee any more than it will second guess the judgment of the doctor.  However, the Court orders that the committee's decision be based upon the exercise of medical judgment, not upon the possibility that Mr. Anderson might abuse a medication.  I note in this regard that Warden Jones testified that if the clinical staff were to prescribe the medication Mr. Anderson wants, she would be fine with it.

**B.  Has Mr. Anderson Been Denied an Appropriate Treatment Team"?**

The other goal of the third, fifth and sixth claims is to have the Court order that a multidisciplinary treatment team be created to provide mental health care to Mr. Anderson.  I note that this request is in some ways the converse of the request for stimulant medication. There was no evidence that an individual in the community with Mr. Anderson's illnesses would necessarily be treated by a multidisciplinary team.

According to plaintiff's trial brief [#91], defendants "already use such treatment teams – which typically include the current psychologist, mental health supervisors, correctional officers, and at times prisoners – to monitor and support a prisoner's treatment and progress."  *Id.* at 3.  I agree.  Dr. Koprivnikar testified that Mr. Anderson has been, in effect, treated by a "team," consisting of a psychiatrist (as often as the doctor thinks is necessary), a clinician (either a psychologist or a Masters-level social worker), a case manager, and a medical provider (a family physician if necessary).  While he has been in the QLLP program there has been no formal treatment team as such.  But, the evidence is that he has been treated and prescribed medication

by at least three psychiatrists.  He has received mental health therapy from at least five

psychologists.  The most recent psychologist assigned to him is Dr. Vicky Tuakoi who has been

with him since June 2011, and whom Mr. Anderson describes as "a trooper" who has a great deal

of patience.  He has always had a case manager.  Frankly, despite what I might have thought

about the mental health care provided to prisoners going into the trial, the evidence was that Mr.

Anderson has received substantial mental health counseling and treatment over the years.

Perhaps more importantly, however, the CDOC realized, according to Warden Jones, that

the QLLP program was not effective for mentally ill offenders in administrative segregation.

Therefore, CDOC created the OMI program "to meet the needs of offenders housed in a high

security environment with mental illness and those who are developmentally disabled."

Operational Memorandum 650-108, admitted as Joint Ex. 6, at ¶IV.A.  The goal of the OMI

program is "to assist offenders through a multi-disciplinary approach to correct negative

behaviors and gain tools and appropriate social skills to progress to general population or to the

community."  *Id.*

OMI at the CSP is an eight-level system (followed by four additional levels at the

Centennial North facility) that both trains participants in ways to modify their behavior and

provides incentives in the form of increased privileges (such as telephone sessions, non-contact

visits, canteen spending, television programing, unrestrained movement to the exercise rooms

and showers, unrestrained time for activity therapy and board games, and others) as the inmate

moves up through the incentive levels.  *Id.* ¶IV.G.  Participants in the OMI program may use the

outdoor courtyard in groups of four at Level Eight and groups of two at Level Ten.

OMI is a multidisciplinary team approach.  The team, which collectively forms a "Level

Review Committee" or "LRC," includes mental health therapists (psychologists), case managers,

the housing captain, the law librarian, teachers, drug and alcohol counselors, the pod lieutenant, and correctional officers.  There is no psychiatrist on the team as such, but the therapist can communicate with a psychiatrist, and the psychiatrist has the inmate's chart available for review. The LRC meets weekly, discusses each inmate and whether to move him to a different level, either up or down, and makes recommendations to the Associate Warden, who generally concurs.

Participants in the OMI program receive group as well as individual therapy.  The team attempts to identify for each offender concrete and measurable target behaviors that will assist him in progressing through the OMI program and on to the general population.  Offenders who are extremely disruptive and dangerous receive a "Behavior Modification Plan."  Progression through the levels in the OMI program can be affected by negative chrons (discussed later in this order), incident reports, and participation in group activities.  According to Jill Lampela, Psy.D. who supervises the OMI program, the LRC looks at the substance of any negative chron.

The fact that an Operational Memorandum has lofty goals does not necessarily prove that the program provides appropriate treatment for the affected inmates.  However, the Court was particularly impressed by the testimony of Dr. Lampela.  She describes this as an "incredible program" designed to help mentally ill inmates learn about their illness and to learn coping skills so that they can manage well in a less restrictive environment.  According to her, the OMI has been quite successful in progressing administrative segregation inmates out to general population.  Warden Jones testified that 58 offenders had progressed out of administrative segregation through the OMI program as of the time of the trial.

Mr. Anderson was selected for participation in the OMI program in late 2010 and admitted into the program when space became available in June 2011.  He was an active

participant and attended eight group sessions.  However, he was removed from the program in October 2011 because he was disruptive and was creating an unsafe community for other offenders.  The LRC attempted to keep him in the program but away from other participants, but Dr. Tuakoi and Dr. Lampela ultimately agreed that it was not working.

Nevertheless, Mr. Anderson is eligible to return to the program.  Dr. Lampela believes that he will be ready to return when this case is over.  She testified that Mr. Anderson has been "really focused" on this case, but when the case ends, she believes that he will be able to focus on what they are trying to teach in OMI and be successful.  Dr. Tuakoi believes that if Mr. Anderson could control his verbal outbursts, he would be successful in the OMI program.  She is not convinced that he is ready for readmission yet.  He is participating now in a "WRAP plan," *see* Joint Exhibit 7, and he needs to comply with that plan to become eligible to reapply for OMI. At the present time he has been vacillating between complying and impulsive and threatening behaviors.  However, she believes that returning to and successfully completing the OMI program is an attainable goal.

As with medication, it is not the Court's place to second guess the judgment of health care professionals who seem both capable and sincerely committed to making the OMI program work in general and for Mr. Anderson.  This program provides the multidisciplinary team approach that he desires.

I note that a physician is not a regular member of the team, a fact of which Dr. Patterson is critical.  His criticism is not necessarily without basis.  Psychologists cannot prescribe medicine.  If they do not regularly consult with the CDOC's psychiatrists, or if the psychiatrists do not make themselves readily available, then there is a danger that the full measure of the inmates' needs might not be met.  However, the Court has ordered defendants to assign a

psychiatrist to evaluate with fresh eyes Mr. Anderson's medication and treatment needs, and in the process to consult with Mr. Anderson's current treatment provider.  I cannot speculate that if and when Mr. Anderson returns to the OMI program the team will not have adequate access to a psychiatrist familiar with his situation.

The Court concludes that the opportunity for multidisciplinary treatment is present for Mr. Anderson at the CSP.  The reason that he is not presently in the OMI program relates to his disruptive behavior.  Setting aside the possibility that a medication change could help him control the behaviors that led to his removal from the program, as discussed above, there is nothing evident that the Court could order that would probably improve his ability to take advantage of the opportunity that is there for him.  The Court concludes that Mr. Anderson's claims have not been proven by a preponderance of the evidence with respect to his desire for a multidisciplinary treatment team.

## III.  BARRIERS TO PROGRESSION OUT OF ADMINISTRATIVE SEGREGATION.

As indicated above, inmates who participate in the OMI program have their own eight-level incentive system for obtaining additional privileges and, ultimately, consideration for progression out of administrative segregation into the general prison population.  Until recently, the QLLP was the incentive program for all other inmates.  Mr. Anderson has been in the QLLP except for his four months in the OMI program in 2011.

Mr. Anderson contends that his ability to participate successfully in the QLLP has been limited by two things: his inability to control inappropriate behaviors, due to the lack of effective mental health care; and certain features of the QLLP program itself that have unfairly held him back.  Barriers related to mental health care were discussed in section II of this order.  This section examines the other barriers of which he complains.  Mr. Anderson argues that two

procedures in particular -- a chronological recording system that permits employees arbitrarily and unfairly to place demerits on him, and a review system that provides no useful feedback or guidance on how to avoid those demerits and progress through and out of administrative segregation -- violate his due process rights as guaranteed by the Fifth and Fourteenth Amendments.

Complicating this discussion is the fact that the QLLP was largely replaced by a new policy that went into effect one week after the trial concluded. The Court left the record open following the conclusion of the trial in order to receive the anticipated policy changes and to permit the parties to submit supplemental briefs addressing them.

Therefore, in this section I will first consider whether Mr. Anderson has a constitutionally protected interest in progressing out of administrative segregation. Because I conclude that the answer to that question is "yes," I then examine the two principal parts of the QLLP of which Mr. Anderson complains; then I examine the changes that are contained in the new policy; and finally, I consider whether the stratified incentive system, in its present form, deprives Mr. Anderson of due process.

**A.** **Is There a Protected Liberty Interest in Gaining Removal from Administrative Segregation at the CSP?**

This very issue was addressed and answered affirmatively in *Toevs v. Reid,* 646 F.3d 752 (10th Cir. 2011) (*Toevs* I). The CDOC did not dispute the trial court's conclusion that the conditions of Mr. Toevs' confinement in administrative segregation at the CSP created a liberty interest. The appellate panel agreed. *Id.* at 756. However, that opinion was amended and superseded by the same panel in *Toevs v. Reid,* 685 F.3d 903 (10th Cir. 2012)(*Toevs* II). The court clarified that it did not have to decide whether Mr. Toevs had a liberty interest, because the

23

CDOC did not dispute, for purposes of reviewing the district court's grant of summary judgment in favor of the CDOC, that there was such an interest. *Toevs II,* 685 F.3d at 911.

The question that the circuit did not have to answer in the *Toevs* case is squarely before this Court. Obviously, incarceration deprives an inmate of liberty. One's interest in avoiding incarceration, or even transfer to more adverse conditions of confinement, does not necessarily invoke the due process clause. *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005). However, if the conditions of incarceration impose a significantly atypical and extreme hardship, as compared to the ordinary incidents of prison life, they can create a protected liberty interest in being removed from those conditions. *See Sandin v. Conner,* 515 U.S. 472, 484 (1995).

The Tenth Circuit has listed a number of factors that can be considered in determining whether a liberty interest exists in the context of prison segregation, i.e., "whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . . and (4) the placement is indeterminate." *Estate of DiMarco v. Wyoming Department of Corrections,* 473 F.3d 1334, 1342 (10th Cir. 2007). These factors are not necessarily dispositive. Rather, "the proper approach is a fact-driven assessment that accounts for the totality of conditions presented by a given inmate's sentence and confinement." *Rezaq v. Nalley,* 677 F.3d 1001, 1012 (10th Cir. 2012).

I will assume without deciding that confinement in administrative segregation at the CSP relates to and furthers a legitimate penological interest. Also, no evidence was presented that serving time in administrative segregation will lengthen his period of confinement. Therefore, the first and third *DiMarco* factors tend to weigh against a finding of a liberty interest.

On the other hand, the second *DiMarco* factor weighs in favor of the plaintiff.  I find that the conditions of Mr. Anderson's confinement, particularly including the extreme isolation and the fact that he has remained in administrative segregation for 12 years and counting, are atypical and exceptionally harsh.  *Compare Wilkinson,* 545 U.S. at 214-16, 223-24, *with Rezaq,* 677 F.3d at 1014.  In *Rezaq,* the Tenth Circuit panel concluded that conditions at the federal supermax facility in Florence, Colorado (ADX) were not so extreme as to create a liberty interest in avoiding placement there.  To be sure, the conditions there were harsh, including 23 hours a day in a small cell and all meals alone in the cell.  On the other hand, as the court noted, the inmates had showers in their cells, control over the lights in the cells, the opportunity for outdoor recreation, and the ability to communicate occasionally with other inmates.

As for the fourth *DiMarco* factor, whether placement in administrative segregation was indefinite, the *Rezaq* panel determined that the existence of twice yearly reevaluations of an inmate's placement in administrative segregation with an opportunity to appeal indicated that their placement was not "indefinite."  The critical distinction, however, beyond the fact that the *Rezaq* plaintiffs were no longer at ADX when the case was decided, is the duration of Mr. Anderson's placement in administrative segregation.  Mr. Martin testified that a two-year length of stay in administrative segregation is very substantial.  Confinement for 12 straight years in conditions like those of administrative segregation at the CSP might be unprecedented.  Inmate Mondragon testified that he spent 15 years in administrative segregation within the CDOC, but it was not all in one block.

Considering the totality of the circumstances, as *Rezaq* teaches, the Court concludes that the conditions and duration of Mr. Anderson's confinement in administrative segregation at the

CSP are sufficiently extreme to create a liberty interest worthy of constitutional protection in progressing out.

**B.  Has Mr. Anderson Received Due Process?**

**1.  The QLLP.**

The QLLP was a stratified incentive-based program utilizing increased levels of privileges based upon "demonstrated appropriate offender behavior and program compliance" to motivate and reward participants.  *See* Operation Memorandum 650-100, admitted as Joint Exhibit 10, at ¶¶ I and III.E.  At one time the QLLP had six levels.  *See Toevs II,* 685 F.3d at 908.  The entry level, which was the most restrictive but also expected to last a relatively short time, was Level 1.  Levels 1 through 3 were classified as administrative segregation Levels 4 through 6 were classified as "close custody."  Upon completing level 6 the inmate was eligible for transfer to general population.  Progression through the six levels required a minimum of 13 months.  There was no maximum amount of time.  *Id.*

By the time this case went to trial the QLLP program had changed somewhat.  *See* Operational Memorandum 650-100, admitted as Joint Exhibit 10 (February 10, 2012 ed.).  This version had four levels.  Levels One through Three were traditional administrative segregation. Level Four, called "Thinking for a Change," offered cognitive development classes.  Successful completion of Level Four could result in the inmate's progression out of administrative segregation.

Mr. Anderson has never progressed beyond the third level in either iteration of the QLLP. As indicated above, plaintiff's objections to the QLLP system focus on two parts of the progression system: the chronological recording system, in particular the recording and impact of

"negative chrons;" and an administrative review process that he contends provided no meaningful review.

a. <u>Negative chrons</u>.

Progress through the levels of the QLLP depended upon the inmate's behavior and completion of required programs. With respect to behavior, the CSP maintained what it called a "Chronological Recording Database." Any employee could at any time enter either a positive or a negative comment on some behavior of an inmate that the employee observed. These comments were commonly referred to as positive or negative "chrons." There were no written standards for what behavior could be "chroned."

Negative chrons impeded an inmate's progress through the QLLP levels. According to Case Manager Daniel Dennis, one "minor" negative chron would not prevent an inmate from progressing from Level Two to Level Three in the QLLP system. However, Case Manager Darla Jimenez testified that an inmate had to be totally chron-free for 90 days in Level Three in order to go before the Classification Committee for a decision as to whether the inmate could move out of administrative segregation into Level Four. At a minimum, therefore, a negative chron would cause the inmate to have to re-start the time clock for completion of Level Three. According to Ms. Jimenez, one negative chron could cause the inmate to be regressed to a lower QLLP level, such as from Level Three to Level Two or even all the way back to Level One. Plaintiff's expert Steve Martin concluded from his investigation that a negative chron of any kind would cause the inmate to be regressed from Level Three to Level Two.

Warden Jones disagreed somewhat. She testified that the practice of permitting one negative chron, no matter what its substance, to act as a veto to upward progression had changed approximately one year before the trial, and she assumed that case managers and others were

following the newer practice.  Even so, it is beyond dispute that negative chrons constituted a serious impediment to progression.  Inmate Bueno, for example, testified that he spent nine years in administrative segregation at the CSP even though he had only two "write-ups," meaning Code of Prison Discipline or "COPD" charges during all that time, because negative chrons kept him there.

Frequently the inmate would not know that he had been "chroned" at the time.  Unless the employee who entered the chron chose to inform the inmate, he would learn of the negative (or positive) chron when he received a monthly Administrative Segregation Classification Review form, known as an "ASR," in the internal mail.  Even then the ASR provided only cryptic information as to what the chron was for.  In no case was the inmate given an opportunity to present contrary evidence.

Mr. Anderson does not dispute that some negative chrons recorded against him legitimately reflected inappropriate behavior.  For example, Mr. Anderson has received negative chrons for threats to harm or kill guards, threats to throw feces, verbal abuse and other disruptive behavior.  On the other hand he has received negative chrons for what on their face seem like more minor incidents, such as not returning a food tray; banging in the shower; and attempting to order a canteen item not authorized for the CSP.  Joint Exhibit 2 at Bates # 23353; Joint Exhibit 4 at Bates #13825.  His complaint is that a system that permits any employee to record a negative chron, with no standard for what constitutes chronable behavior, no check on whether the negative chron was deserved, and no serious consideration of the chron's substance, is unfair.

The plaintiff and plaintiff's corrections expert, Mr. Martin, propose that the Court order the elimination of the chronological reporting system.  Instead, behavioral issues would be addressed solely through the COPD system.  The Code of Prison Discipline identifies behaviors

that could support a COPD conviction.  When a COPD complaint is filed, the inmate is entitled

to a due process hearing including the opportunity to present evidence.

      b.  <u>Administrative segregation reviews</u>.

The other procedure challenged by Mr. Anderson was the poor quality of his monthly

reviews.  In the *Toevs* case the inmate contended that he was denied due process because the

periodic reviews he received in Levels 1 through 3 of the six-level QLLP system were

"perfunctory, meaningless, and all said the same thing;" and because he received no reviews at

all in Levels 4 through 6.  *Toevs II,* 685 F. 3d at 908.  The Tenth Circuit agreed that he was

entitled as a matter of due process to "meaningful" reviews.  A "meaningful review" in a

behavior-modification program "evaluates the prisoner's current circumstances and future

prospects, and, considering the reason(s) for his confinement to the program, determines whether

that placement remains warranted." *Id.* at 913.  In a stratified incentive program such as the

QLLP, a meaningful review "would consider whether the prisoner is eligible to move to the next

level or, if the prisoner already is at the highest level, whether he or she is eligible to graduate

from the program." *Id.*  It should "provide a statement of reasons, which will often serve as a

guide for future behavior (i.e., by giving the prisoner some idea of how he might progress toward

a more favorable placement)," because the goal of placement in a stratified incentive program "is

solely and exclusively to encourage a prisoner to improve his future behavior." *Id.*

The court held that Mr. Toevs had not received meaningful reviews.  For example, he

was not given meaningful information as to why he was being held at a certain level.  Certain

classes were recommended, but there was no indication whether they had to be completed in

order to progress to a higher level. *Id.* at 914-15.

Administrative segregation reviews are conducted monthly by the inmate's case manager. Under the system in place at the time of trial, the case manager filled out the ASR form, presented it to a supervisor for signature, and sent it to the inmate through the internal mail.  Mr. Anderson's ASR's were admitted collectively as Joint Exhibit 2.  They demonstrate that the quality of the reviews was not much improved for several months following the first *Toevs* decision, which was issued on June 20, 2011.

The first post-Toevs ASR, issued to Mr. Anderson on July 11, 2011 when he was still in the OMI program, contains a sentence not found in previous reviews: "Progression out of the CSP OMI program is contingent upon program compliance, demonstration of appropriate behavior, and approved progression to OMI Level 9 as defined in OM 650-108." *Id.* at Bates # 23355.  This sentence was repeated in the next several reviews.  Then, after Mr. Anderson was removed from the OMI program, the sentence changed to state: "Progression out of the CSP Quality of Life program is contingent upon program completion, demonstration of appropriate behavior, and approval through the CSP classification process as defined in IA 600-2 and OM-650-100." *Id.* at Bates # 24494.  That sentence was then repeated in subsequent reviews through and including his most recent review at the time of the trial, issued March 6, 2012.  *Id.* at the first (unnumbered) page of the exhibit.

Receiving an ASR containing those sentences through the mail, with no in-person elaboration or explanation, does not constitute a "meaningful review."  In fact, it's worse than that.  The ASR form contains what amounts to a series of check boxes under the heading, "Justification" for retention in administrative segregation.  In Mr. Anderson's last five ASR's, the boxes checked are "Continue Behavioral Review" and "Lack of Program Participation."  The ASR gives no clue as to what "Continue Behavioral Review" means.  "Lack of Program

Participation" has no basis in fact.  It is undisputed that Mr. Anderson has completed the programs that are available to him (except, of course, the QLLP and the OMI programs themselves).  Case Manager Jimenez testified that case managers cannot delete that check mark from the form, even if the inmate has completed available programs.  The check stays there until the inmate is approved to move to Level Four.

Three of Mr. Anderson's post-Toevs ASR's, covering reviews for the period of October through December 2011, also have a check in the box for "Erratic/Disruptive Behavior."  Joint Exhibit 2 at Bates ##23347, 24494, and 23827.  Perhaps this refers to the behaviors that resulted in his removal from the OMI program in October and carried over into the next two ASR's.  The ASR's do not say.

Nowhere do these ASR's provide meaningful input to Mr. Anderson as to what he needs to do to progress.  These ASR's remained much as Mr. Toevs described them: "perfunctory, meaningless, and [they] all said the same thing."

### 2.  The "Progressive Management" program.

Throughout the trial CDOC witnesses indicated that "change is on the way."  I do not say that cynically.  The CDOC had the *Toevs* case and the Austin-Sparkman report to consider. Also, the evidence revealed that the current Executive Director of the CDOC wished to reduce the number of inmates in administrative segregation.  By the time of trial the CDOC had already significantly reduced the number of inmates in administrative segregation at the CSP through a new process of having Deputy Directors conduct individual reviews of every inmate who had been in administrative segregation for a lengthy period of time.  According to Mr. Reid, these reviews were implemented to make sure that inmates are not being kept in administrative segregation over minor issues.  A Deputy Director's review of Mr. Anderson's situation resulted

in a recommendation that he be placed in the OMI program, although he was already in that program at the time.

However, more changes were announced on May 15, 2012 when the CDOC issued Administrative Regulation 650-03, submitted to the Court as Exhibit A-1 to the defendants' supplemental brief [# 107-1]. This AR revised CDOC's policies regarding administrative segregation. The QLLP apparently no longer exists as such. I am not sure how the CDOC will refer to the new policy, but I will label it "Progressive Management," after part IV.G which describes the new version of the stratified incentive system.

The Progressive Management program has five "Privilege Levels," denominated I, II, III, IV A, and IV B. *Id.* ¶IV.H. Privilege Levels I through III appear to correspond to the previous three administrative levels, although the entry level is Privilege Level II. Privilege Level IV A, also called "Cognitive Programming," appears roughly to correspond to the previous Level Four. It is designed as a transition level between administrative segregation and general population. Privilege Level IV B is for offenders who have completed the first three levels but who continue to pose a substantial security risk if they were returned to general population. Progress through the Privilege Levels is estimated "typically" to take a minimum of nine months. *Id.* ¶IV.G.1.

The program makes a number of procedural changes including, among others, the following:

- "At all levels, offenders will be afforded a meaningful monthly out of cell meeting with their case manager. The case manager meeting will be documented in the electronic chronological log." *Id.* ¶G.5. The discussion between the inmate and the case manager at the monthly meeting should include but not be limited to (a) current level status; (b) the offender's efforts to obtain life skills necessary to be a success

upon release, and planning for employment and other post-release matters (c) recent
behavior, including negative and positive chrons, incident reports and COPD
convictions; (d) behaviors that might have resulted in COPD convictions or prior
administrative segregation placements, including discussion "about what is needed to
overcome these problems, i.e., making better choices; (e) program completion and
needs; (f) work assignments and work history; (g) whether the offender has clinical
issues or needs clinical treatment; (h) progression off of administrative segregation
status; and (i) STG (Security Threat Group, essentially gang) affiliation and activity."
*Id.*

- In each level of the progression system, privileges may be suspended up to seven
  days for an offender's negative behaviors.  A chronological entry of the offending
  behavior will be made; an incident report will be completed; and the on-site
  supervisor will be notified, which will be documented in the chronological record.
  The offender will be notified in writing, within one working day, of the negative
  chron, the date and time of the behavior, and the staff person taking the action.  *Id.*
  ¶¶H.1.g.; H.2.f; H.3.g.; H.4.h; H.5.g.

- At Privilege Level II, which again is the point of entry for an offender newly assigned
  to administrative segregation, the individual "will be oriented to their behavioral
  expectations while in Administrative Segregation and the requirements for working
  their way out of Administrative Segregation.  The orientation expectations will be
  provided in writing utilizing form 650-03C." *Id.* ¶H.2.c.

- AR Form 650-03C, entitled "Administrative Segregation Privilege Level Review,"
  apparently is the new ASR form.  The offender's progression is charted on another

AR form, number 650-03F.  This form requires a specific indication of what is required for the offender to progress or continuing progressing.  The forms are distributed to the offender.

- In a section entitled "Level Movement," the new policy provides that the "Housing supervisor (CO IV) and the assigned case manager will conduct a review of all chronological log entries and any other applicable documentation.  Negative chronological entries will not prevent the review from occurring."  *Id.* ¶I.1.b.  Any CDOC employee may recommend reassignment of an offender to a lower level based documented negative behavior, but the Housing supervisor or Shift Commander will be notified of all such recommendations and will approve or deny them.  Level changes will be reviewed by the internal classification committee for a final decision.  *Id.* ¶I.2, 3.

- In a section entitled "Monitoring and reviews," the new policy requires that a "qualified mental health DOC employee or contract worker" will personally interview and review the status of any offender in administrative segregation for longer than 30 days; prepare a written notification of findings; and conduct a mental health interview every 30 days, outside of the offender's cell in a confidential location.  Offenders in administrative segregation "shall" be reviewed by their case manager every 30 days, outside the offender's cell.  A monthly written review by the case manager will be provided to the internal classification committee.  A CDOC Deputy Director will meet with every offender who has been in administrative segregation for one year and review the case to determine if continued placement in administrative segregation is warranted.  *Id.* ¶J.

- Offenders in administrative segregation will receive daily visits from the senior correctional supervisor in charge, daily visits from a qualified health care official (unless more frequent medical attention is needed), and visits from members of the program staff upon request. *Id. ¶*L.

3. **Has the new "Progressive Management" system removed any due process violations that were present?**

The CDOC's supplemental brief touts the new policy as mooting plaintiff's concerns relating to negative chrons and administrative reviews. Plaintiff' supplemental brief expresses skepticism. I am closer to the defendants' position.

With respect to the new administrative review procedures, plaintiff's counsel concede that the monthly meetings with case managers required by the new policy have "the *potential* to provide guidance to prisoners concerning what they need to do to progress." Plaintiff's Brief on New CDOC Regulations [#106] at 4 (emphasis in original). However, they continue, "there is nothing to indicate that this will be anything more than a rote repetition of what is on the paper form." *Id.* Counsel question how effective the reviews will be in helping prisoners with mental illness, but they acknowledge that "[o]verall, until the reviews are happening, there is no ability to determine whether they provide meaningful – or any – guidance to prisoners as to what is needed to progress." *Id.*

Like any other policy or procedure, this will only be as effective as the good faith efforts of the employees charged with implementation make it. However, the Court at this point has no basis to conclude that the new policy will deny Mr. Anderson due process in terms of the quality of his administrative reviews. Instead of sending a relatively meaningless ASR to the employee through the mail, the case managers now must meet with each inmate monthly, outside the cell,

and discuss a specific list of topics including chrons, behavioral issues in general, and what the inmate needs to do to overcome perceived problems and progress. On its face this represents a reasonable response to *Toevs* and a substantial improvement on the old review system.

Plaintiff's attorneys focus their criticism of the new policy primarily on negative chrons, arguing that it "makes no change to the negative chron system." Plaintiff's Brief on New CDOC Regulation [#106] at 2. I do not entirely agree. Negative chrons must be discussed with the inmate at the monthly out-of-cell meeting with his case manager. Any negative chron that results in a suspension of privileges must be supported by an incident report; the on-site supervisor must be notified; and the offender must be notified in writing within one day. For purposes of level movement all negative chrons are reviewed by the Housing Supervisor and the Case Manager. A negative chron will not prevent that review from occurring. Any recommendation that an offender be reassigned to a lower level must be based on documented negative behavior which is reviewed by the Housing Supervisor or Shift Commander and then the internal classification committee before action is taken.

Plaintiff lists several concerns about negative chrons that he believes have not been addressed. First, a negative chron can still be given by any employee for any reason. That appears to be true. However, the new policy builds in more review, particularly if a negative chron will be used as the basis to suspend privileges or to affect level movement. A negative chron will not prevent such reviews.

Closely related, plaintiff notes that the new policy still provides no protocol as to what is considered to be appropriate and inappropriate behavior. It likely is impossible to list every possible negative behavior. However, it is implicit in the new policy that inmates will be generally informed as to what behaviors are appropriate, what behaviors are inappropriate, and

which of the latter group will likely halt progression and potentially be the basis for a regression review.  That appears to be built into the new policy for inmates coming into administrative segregation at Level II.  It is explicit that the inmate's behaviors will be discussed with him, and he will be given guidance on what he needs to improve.  Warden Jones identified five behaviors that she considers to be significant negative behaviors: throwing things, particularly bodily fluids; barricading; covering the cell (so employees cannot see in); threats; and making weapons. Deputy Director Reid listed assaults, threats, disruption, and recruiting others to disrupt, as noncompliant behaviors.

Plaintiff complains that employees are still not required to give the employee contemporaneous notice of a negative chron.  That is not true if the negative chron is the basis of any suspension of privileges.  I agree that it would be better if employees did notify inmates contemporaneously of the recording of a negative (or positive) chron, and perhaps with the CDOC's and this Court's encouragement they will.  At a minimum, the inmate will learn of the chron at the monthly case manager meeting.

Plaintiff points out that the inmate is still not afforded an opportunity to respond to the charge.  It is true that the new policy does not guarantee an immediate opportunity to respond to a negative chron.  The Tenth Circuit indicated, though not in the specific context of a negative chron, that due process does not require that inmates be given the opportunity to submit additional evidence during monthly reviews.  *Toevs II,* 685 F.3d at 913.  Nevertheless, the new policy does provide the inmate the opportunity to discuss a negative chron and provide his input at the monthly meeting.

Finally, plaintiff worries that a single negative chron can still deny an inmate progression out of administrative segregation.  This appears to be possible.  However, as indicated above, all

chronological entries are to be reviewed before any level change is made, and a negative chron will not prevent that review.  In my view it is implicit in the new policy that the substance and the seriousness, not just the mere existence, of a negative chron will be considered in making decisions regarding level progression and, ultimately, progression out of administrative segregation.  In Mr. Martin's words, "if you're not looking behind [the chron], you're just pushing paper."

Because plaintiff's goal was to eliminate the chronological reporting system entirely, it might be that no tweaking of the system would be satisfactory to him.  In fairness, however, it must be recognized that the chronological reporting system has positive aspects.  Chrons enable what Mr. Reid calls the "boots on the ground people" to note behavior problems without triggering a formal COPD disciplinary proceeding every time inappropriate behavior is observed.  The chron record is a potentially valuable picture of the inmate's behavior over time.  It gives employees a form of protection against abusive behavior.  It also should not be forgotten that the system permits employees to record positive chrons.  It is not a system with which this Court should meddle lightly.

The bottom line is that, if used fairly, the chronological recording system will not be inconsistent with constitutional due process.  It appears to this Court that AR 650-03 reflects a significant effort by the CDOC to improve the evaluation and review policies for administrative segregation inmates.  It deserves to be given a chance.  If it proves to be form over substance, Mr. Anderson knows where to find me.

**ORDER**

1. The Court enters judgment in favor of the plaintiff and against defendants on plaintiff's Fourth Claim for Relief.  The Court orders that within 60 days the CDOC

must develop and present to plaintiff's counsel and the Court a plan that ensures that Troy Anderson has access for at least one hour, at least three times per week, to outdoor exercise in an area that is fully outside and that includes overhead access to the elements, e.g., to sunlight, rain, snow and wind, unless inclement weather or disciplinary needs make that impossible.  Plaintiff may file objections, if any, to the plan within 21 days.  Defendants may reply within 14 days following plaintiff's submission of objections.

2. The Court orders defendants to assign a CDOC physician to take a fresh look at Mr. Anderson's medication and treatment needs as set forth in this Order.  With that exception, the Court enters judgment in favor of the defendants on plaintiff's Third Claim for Relief.

3. Plaintiff has brought to the Court's attention legitimate concerns about how chronological reporting and administrative reviews have functioned in the past. Administrative Regulation 650-03 has addressed some of those concerns expressly, and it appears to the Court that others are addressed implicitly.  In the spirit of giving the new policy and those who will implement it a fair chance, the Court enters judgment in favor of the defendants on plaintiff's First Claim for Relief.

4. The Court enters judgment in favor of the defendants on plaintiff's Fifth and Sixth Claims for Relief.

5. Plaintiff's Second Claim for Relief has been withdrawn.

6. The plaintiff prevailed on the outdoor exercise issue, which was a central focus of the case; the relief ordered will directly and materially benefit Mr. Anderson (and perhaps others).  The plaintiff prevailed in obtaining an order that his medical and

treatment needs must be looked at afresh by a physician, and that the possibility that

he might abuse any particular medication may not trump a decision concerning care

he needs based on medical judgment.  While the plaintiff did not convince the Court

to order the elimination of the chronological reporting system, the plaintiff's

expressions of concern about certain things not expressly covered in AR 650-03 have

been noted.  Accordingly, while both parties prevailed on some claims, the Court

finds that the plaintiff is the overall prevailing party for purposes of costs and

attorney's fees.  Counsel are directed to confer and attempt in good faith to reach

agreement on the amount of costs and attorney's fees.  If agreement is not reached,

then plaintiff will proceed in accord with the requirements of Fed. R. Civ. P. 54(d)

and D.C.Colo.LCivR 54.1.

DATED this 24th day of August, 2012.


BY THE COURT:

_____

R. Brooke Jackson
United States District Judge